(No. 82988.—

# TEXACO-CITIES SERVICE PIPELINE COMPANY, Appellant, v. SAM McGAW, Acting Director of Illinois Department of Revenue, Appellee.

*Opinion filed April 16, 1998.—Rehearing denied June 1, 1998.*

BILANDIC, J., joined by McMORROW and NICKELS, JJ., dissenting.

Fred O. Marcus, James H. Ryan and Jordan M. Goodman, of Horwood, Marcus & Berk, Chrtd., of Chicago, and David J. Dziak, of Houston, Texas, for appellant.

James E. Ryan, Attorney General, of Springfield (Barbara A. Preiner, Solicitor General, and Deborah L. Ahlstrand, Assistant Attorney General, of Chicago, of counsel), for appellee.

CHIEF JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, Texaco-Cities Service Pipeline (Texaco-Cities), brought an action for administrative review in the circuit court of Cook County against defendant, the acting director of the Illinois Department of Revenue (Department). Texaco-Cities sought review of the Department's determination that (1) proceeds from the sale of a pipeline and associated assets constituted "business income" under the Illinois Income Tax Act (Act) (35 ILCS 5/101 *et seq.* (West 1994)), and (2) the income was apportionable under the single-factor, "barrel miles" formula of section 304(d)(2) of the Act (35 ILCS 5/304(d)(2) (West 1994)). The circuit court affirmed the Department's classification of the sale proceeds as business income, but agreed with Texaco-Cities that the gain from the sale had been improperly apportioned. Both parties appealed. The appellate court affirmed the circuit court with respect to the classification issue. 286 Ill. App. 3d 529. The court disagreed with the apportion-

ment determination, however, and as a result, reinstated the Department's original apportionment of the sale proceeds. We granted Texaco-Cities' petition for leave to appeal (166 Ill. 2d R. 315), and now affirm the appellate court.

## BACKGROUND

Texaco-Cities, a Delaware corporation with its principal offices in Houston, Texas, is in the business of transporting crude oil and other petroleum products by pipeline. As part of its business, Texaco-Cities owned and operated pipelines which ran through several states, including Illinois. During the 1983 tax year, Texaco-Cities sold major segments of its pipeline assets and associated real estate, including its entire contingent of pipeline assets in Illinois. Prior to the sale, the pipelines sold had serviced the Texaco refinery in Lockport, Illinois, and the Cities Service, East Chicago refinery. However, these refineries subsequently ceased operations, idling the pipelines and rendering them of little operational value to Texaco-Cities. Thus, Texaco-Cities sold them to other companies with a refinery presence in the Chicago area. Texaco realized a gain from the sale of $9,987,176. The sale resulted in a nearly 90% reduction of Texaco-Cities' total pipeline miles.

On its return for the tax year 1983, Texaco-Cities reported the income from the sale as nonbusiness income, and allocated to Illinois $2,807,995 of the total gain, based upon the ratio of pipeline assets sold in this state to those sold everywhere. Texaco Cities' remaining income was reported as business income, and apportioned as such under section 304(d)(2) of the Act.

The Department audited Texaco-Cities' tax returns for the tax year in question and, based upon the audit, assessed a deficiency against Texaco-Cities in the amount of $208,441. First, the Department reclassified the gain from the sale of the pipeline assets as "busi-

ness income" subject to apportionment, finding that the sale constituted an "integral part of [Texaco-Cities'] trade or business operations" under the Act. Then, the Department apportioned Texaco-Cities' base income, including the gain from the sale, by the single-factor "barrel miles" formula articulated in section 304(d)(2) of the Act. Texaco-Cities filed a protest to the Department's decision, and the case was presented to an administrative law judge. The matter proceeded for a hearing on a stipulation of the facts set forth above, and upon the following stipulated issues: (1) whether the gain from the sale of pipeline assets constituted business income; and (2) if so, whether it was properly subject to apportionment under section 304(d)(2) of the Act, as "business income derived from transportation by pipeline." 35 ILCS 5/304(d)(2) (West 1994).

In the administrative proceedings, Texaco-Cities disputed that the sale proceeds were business income, asserting that its business did not consist of disposing of large quantities of its pipeline assets. Instead, Texaco-Cities maintained, the sale was an extraordinary event and more in the nature of a cessation than a furtherance of business. Texaco-Cities further contended that the Department had improperly apportioned the sale proceeds under the barrel miles formula of section 304(d)(2), because that section encompassed only income derived "from transportation by pipeline." Rather, Texaco-Cities claimed that the income should have been apportioned under the standard three-factor formula in section 304(a) (35 ILCS 5/304(a) (West 1994)).

The administrative law judge issued a recommended disposition upholding the determination of the Department, and the disposition was accepted by the Department. In its complaint for administrative review, Texaco-Cities renewed its contentions in the administrative proceedings, and also argued that the apportion-

ment under the barrel miles formula resulted in a deprivation of its due process rights under the United States Constitution.

The circuit court issued a memorandum decision and judgment affirming the Department's characterization of the income as business income. However, the court agreed with Texaco-Cities that the gain was improperly apportioned under the barrel miles formula and that it should have been apportioned under the three-factor formula of section 304(a). The court made the additional finding that apportionment under the barrel miles formula would amount to a deprivation of Texaco-Cities' due process rights.

On appeal, the appellate court affirmed the finding that the gain was business income. However, the court reversed the circuit court's apportionment of the gain under the three-factor formula and reinstated the Department's application of the single-factor apportionment. The court declined to reach the question of whether apportionment under section 304(d)(2) amounted to a violation of due process, finding that Texaco-Cities had waived the issue by failing to raise it in the first instance in the administrative proceedings. 286 Ill. App. 3d 529.

## ANALYSIS

### I. Classification as Business Income

Texaco-Cities first challenges the Department's determination that the gain from the sale of its pipeline assets constituted business income. Section 1501(a)(1) of the Act defines "business income" as:

> "income arising from transactions and activity in the regular course of the taxpayer's trade or business ***, and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." 35 ILCS 5/1501(a)(1) (West 1994).

Conversely, "nonbusiness income" is defined as all income other than business income. 35 ILCS 5/1501(a)(13) (West 1994). In general, nonbusiness income from tangible property is allocated to the state that is the situs of the property based upon the application of statutory factors. Business income, on the other hand, is apportioned among states based upon their respective "contribution to the environment that permitted the corporation to earn an income." 1 Ill. Tax Reporter, par. 12—004, at 1473 (1987). An entity claiming that its income is nonbusiness income bears the burden of clearly proving this fact. See generally *Canteen Corp. v. Department of Revenue*, 123 Ill. 2d 95, 106-07 (1988); *National Realty & Investment Co. v. Department of Revenue*, 144 Ill. App. 3d 541 (1986).

The definition of business income in section 1501(a)(1) is virtually identical to that established in section 1(e) of the Uniform Division of Income for Tax Purposes Act (UDITPA), from which our act was derived. The UDITPA was subsequently adopted as article IV of the Multistate Tax Compact (MTC) (*Asarco Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 310 n.3, 73 L. Ed. 2d 787, 791 n.3, 102 S. Ct. 3103, 3106 n.3 (1982)), and to the extent the language of our act parallels that of the MTC, we may examine the policies underlying the MTC and the UDITPA in arriving at the meaning of our act. See *Caterpillar Tractor Co. v. Lenckos*, 84 Ill. 2d 102, 121 (1981). States adopting the UDITPA have recognized that the language of section 1501(a)(1) encompasses two tests for determining whether income from the disposition of capital assets constitutes business income: the "transactional" test, embodied in the first clause of the definition, and the "functional" test, contained in the second clause. See, *e.g.*, *Ross-Araco v. Commonwealth of Pennsylvania, Board of Finance & Revenue*, 544 Pa. 74, 674 A.2d 691 (1996); *District of Columbia v. Pierce As-*

*sociates, Inc.,* 462 A.2d 1129 (D.C. 1983). Income is business income under the transactional test if it is "attributable to a type of business transaction in which taxpayer regularly engages." *National Realty,* 144 Ill. App. 3d at 554. More broadly, under the functional test, all gain from the disposition of a capital asset is considered business income if the asset disposed of was "used by the taxpayer in its regular trade or business operations." *National Realty,* 144 Ill. App. 3d at 554; see also *Ross-Araco,* 554 Pa. 74, 674 A.2d 691 (if asset produced business income while it was owned by the taxpayer); *Laurel Pipe Line Co. v. Commonwealth of Pennsylvania, Board of Finance & Revenue,* 537 Pa. 205, 642 A.2d 472 (1994); *Pierce,* 462 A.2d 1129. The frequency and regularity of the transaction at issue are central considerations in applying the transactional test. Under the functional test, however, the extraordinary nature or infrequency of the sale is irrelevant. *Ross-Araco,* 544 Pa. at 79, 674 A.2d at 693. The income constitutes business income if either one of the above tests is met. *National Realty,* 144 Ill. App. 3d at 554; see *Ross-Araco,* 544 Pa. at 79, 674 A.2d at 693; *Pierce,* 462 A.2d at 1131 (two clauses set forth independent, alternative tests).

The parties agree that the resolution of this case turns upon an interpretation of the latter clause of section 1501(a)(1), addressed to income from tangible and intangible assets. The Department conceded that the sale of Texaco-Cities' pipeline did not fall under the transactional test. Thus, we focus our analysis upon the second clause of section 1501(a)(1), and the applicability of the functional test.

Texaco-Cities argues that income is business income only if it arises from transactions and activities occurring in the regular course of a taxpayer's business. In making this argument, Texaco-Cities interprets the

second clause of the definition as merely a subset of the first clause. Thus, it reasons, in order to fall under the latter clause, asset income must be "regularly generated gain" from the disposition of property "by taxpayers who emphasize the trading of such assets as an integral part of their regular business." Texaco-Cities contends that the disposition of its pipeline assets does not fit into this category because it was a "one-time, extraordinary" gain rather than an integral part of its regular trade or business operations.

In construing a statute, this court strives to ascertain and give effect to the intent and meaning of the legislature, and this effort properly begins with an examination of the statutory language. *Advincula v. United Blood Services*, 176 Ill. 2d 1, 16 (1996). Each undefined word in the statute must be ascribed its ordinary and popularly understood meaning. *Canteen*, 123 Ill. 2d at 105. The court should evaluate the statute as a whole and construe it, if possible, so that no term is rendered superfluous or meaningless. *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 397 (1994).

Initially, we cannot agree that the second clause of section 1501(a)(1) is simply a subset of the first clause. The first clause consists of general language encompassing all activity in the "regular course of the taxpayer's trade or business." The second clause enlarges this definition to include income from property, as long as its "acquisition, management, and disposition" constitute "integral parts of the taxpayer's regular trade or business operations." The predicate phrase "in the regular course of business" is replaced in the second clause with "integral parts of regular business operations," resulting in two manifestly different definitions. See *Kroger Co. v. Department of Revenue*, 284 Ill. App. 3d 473, 479 (1996).

Turning to the meaning of the second clause, we note that the term "integral" means "of, relating to, or

serving to form a whole: essential to completeness: organically joined or linked." Webster's Third New International Dictionary 1173 (1993). The term "operations" is defined as "b: the whole process of planning for and operating a business or other organized unit \*\*\* c: a phase of a business or of business activity." Webster's Third New International Dictionary 1581 (1993). Placed in their statutory context, these terms indicate that the acquisition, management and disposition of the income-producing property must closely relate to the taxpayer's regular trade or whole process of operating its business. Further, in our view, the words "acquisition, management, and disposition" suggest elements typically associated with the "keeping" of corporate property, or, as observed in *Kroger*, the "conditions of ownership" of corporate property. 284 Ill. App. 3d at 479. Thus, interpreting the second clause as a whole, the sale of property will constitute business income if the property and sale are essential to the taxpayer's business operations.

According to Texaco-Cities, the second clause mandates that the taxpayer "emphasize the trading" of the sold assets as an integral part of its regular business. Accord *Phillips Petroleum Co. v. Iowa Department of Revenue & Finance*, 511 N.W.2d 608, 610 (Iowa 1994). We think that, had the legislature intended for this section to be confined to taxpayers who routinely trade assets, or to gain from the sale of inventory, it could have said so. Texaco-Cities' construction narrowly focuses upon the "regularity" or frequency of the transaction that produced the income. Instead, the reach of the second clause is much broader, directed towards the use or disposition of the property as forming an integral part of the taxpayer's business. See *McVean & Barlow, Inc. v. New Mexico Bureau of Revenue*, 88 N.M. 521, 525, 543 P.2d 489, 493 (1975) (Lopez, J., dissenting).

Notwithstanding our interpretation, Texaco-Cities questions the validity of the functional test under the plain language of the statute, relying upon cases in other jurisdictions that have rejected the test.

We find the functional test to be consistent with the above reading of the plain language of the statute. The functional test classifies as business income all gain from the disposition of a capital asset if the asset was "used by the taxpayer in its regular trade or business operations." As discussed previously, the second clause of section 1501(a)(1) focuses upon the role or function of the property as being integral to regular business operations. The use of a capital asset in the taxpayer's regular trade or business indisputably renders that asset an integral part of the taxpayer's regular business operations.

The adoption of the functional test also comports with the legislative history and purpose behind the Act. The test was adopted directly from the comments underlying the UDITPA, which predate the enactment of our act, and which state that "[i]ncome from the disposition of property used in a trade or business of the taxpayer is includible within the meaning of business income." Uniform Division of Income for Tax Purposes Act, 7A U.L.A. § 1, Comment (1966), *reprinted in* 2 Multistate Corporate Income Tax Guide (CCH) par. 8805. The test also is supported by regulations promulgated by the Department, which, although not binding upon us (*Canteen*, 123 Ill. 2d at 104-05), are entitled to substantial deference. See 86 Ill. Adm. Code §§ 100.3010(a), (d)(3) (1996). In particular, section 100.3010(d)(3) classifies as business income capital gain from assets which, while owned by the taxpayer, were "used in its trade or business."

Having arrived at the meaning of the statute, we now apply the functional test to the facts of this case,

and conclude that Texaco-Cities has failed in its burden of proving that the gain from the sale of its pipeline assets was nonbusiness income. According to Texaco-Cities' tax return for the year in question, its business was "pipeline transportation." The pipelines sold were among several that Texaco-Cities employed to transport petroleum and other substances in its regular course of business. There was no dispute that they were used for the production of business income.

Texaco-Cities seeks to analogize the facts of this case to *Laurel Pipe Line*, 537 Pa. 205, 642 A.2d 472, involving a statute nearly identical to ours. There, the court adopted the transactional and functional tests, but concluded that proceeds from the sale of an independent pipeline by a company in the business of transporting refined petroleum products was nonbusiness income. We find the facts in that case to be distinguishable from the facts at bar. The court in *Laurel Pipe Line* found that the sale was a liquidation of a "separate and distinct aspect" of Laurel's business, namely, all of its pipeline operations in a specific geographical region. *Laurel Pipe Line*, 537 Pa. at 213, 642 A.2d at 476, citing *McVean & Barlow*, 88 N.M. 521, 543 P.2d 489. In reaching this conclusion, the court considered the "totality of the circumstances surrounding the sale," including the fact that the sales proceeds were distributed to the shareholders rather than being used to acquire business assets or generate income for use in future business operations. *Laurel Pipe Line*, 537 Pa. at 213-14, 642 A.2d at 476-77. In the case at bar, by contrast, it was undisputed that following the sale, Texaco-Cities remained primarily in the business of providing transportation by pipeline, and that the sales proceeds were invested right back into that business rather than being disseminated to its shareholders. See *Welded Tube Co. v. Commonwealth*, 101 Pa. Commw. 32, 515 A.2d 988 (1986).

Unlike the cases upon which Texaco-Cities relies, there was no evidence that this sale was a cessation of a separate and distinct portion of Texaco-Cities' business. *Cf. McVean & Barlow*, 88 N.M. 521, 543 P.2d 489. Thus, the gain from the sale was properly classified as business income subject to apportionment under the Act.

## II. Apportionment

We now proceed to the question of whether the business income from the sale of pipeline assets was correctly apportioned. Texaco-Cities argues that the gain should have been apportioned under the general, three-factor formula encompassed under section 304(a) of the Act, rather than the single-factor "barrel miles" formula in section 304(d)(2).

In apportioning the income of multistate, unitary businesses operating within this state, Illinois uses a formula approach known as "formula apportionment." Under this system, the income of the business is calculated, and a formula is applied to apportion that sum based upon the ratio of the taxpayer's activities in Illinois to its activities everywhere. *Citizens Utilities Co. v. Department of Revenue*, 111 Ill. 2d 32, 40 (1986). The most commonly known is the three-factor formula, which is prescribed in section 304(a) of the Act (35 ILCS 5/304(a) (West 1994)) and is nearly verbatim to that established in the UDITPA and the MTC. *Caterpillar*, 84 Ill. 2d at 121. Under section 304(a), business income from a multistate corporation is, except as otherwise provided, apportioned to this state by multiplying the income by a formula which measures the taxpayer's business activity based upon its property, payroll, and sales within this state.

Section 304 sets forth exceptions to the general three-factor apportionment for "[i]nsurance companies" (35 ILCS 5/304(b) (West 1994)), "[f]inancial organizations" (35 ILCS 5/304(c) (West 1994)), and "[t]ransporta-

tion services" (35 ILCS 5/304(d) (West 1994)). Business income within these categories is apportioned using separate, single-factor formulas, particularly suited to each respective area of business.

In the administrative proceedings, the Department determined that Texaco-Cities' gain should be apportioned under section 304(d)(2). That section states in relevant part as follows:

> "(d) Transportation services. Business income derived from furnishing transportation services shall be apportioned to this State in accordance with paragraphs (1) and (2):
>
> * * *
>
> (2) Such business income derived from transportation by pipeline shall be apportioned to this State by multiplying such income by a fraction, the numerator of which is the revenue miles of the person in this State, and the denominator of which is the revenue miles of the person everywhere." 35 ILCS 5/304(d) (West 1994).

A "revenue mile" denotes the transportation by pipeline of one barrel of oil one mile for consideration. 35 ILCS 5/304(d)(2) (West 1994).

Texaco-Cities argues that section 304(d)(2) unambiguously applies strictly to income arising from the *act* of transporting by pipeline. Thus, the gain from the sale of its pipeline assets must be apportioned under the general formula in section 304(a).

We examine this section cognizant of the general rule that taxing statutes are to be strictly construed, and their language not extended or enlarged beyond its clear import. *Canteen*, 123 Ill. 2d at 105. In addition, we are mindful that where the legislature has seen fit to define a particular statutory term, we are bound by the definition as long as it is reasonable. *Commonwealth Edison Co. v. Property Tax Appeal Board*, 102 Ill. 2d 443, 457 (1984).

Although Texaco-Cities' construction initially ap-

pears persuasive, a close reading of the statutory language renders it incorrect. Section 304(d) expressly applies to *"[b]usiness income derived* from furnishing transportation services." (Emphasis added.) "Business income," as defined by the Act, includes not only income acquired in providing the day-to-day products or services that are part of the "ordinary trade," but also gain from property, if its disposition is an integral part of the taxpayer's regular business operations. 35 ILCS 5/1501(a)(1) (West 1994). When this definition is incorporated into the language of section 304(d) above, the reach of that section necessarily extends beyond the mere act of furnishing transportation services, to include income acquired from property integral to the transportation business itself. Thus, the most fitting construction of section 304(d) would be to include all income earned from the business of furnishing transportation services. As we previously determined, such gain constitutes part of business operations and falls within the broad definition of transportation "services."

Texaco-Cities contends that, when section 304(d)'s language is compared to that employed in sections 304(b) and 304(c), the two other exceptions to the general three-factor apportionment formula, it becomes clear that section 304(d) was intended to be restricted to income from the act of furnishing services. Specifically, while section 304(d) covers income derived from furnishing transportation services, section 304(b) broadly encompasses "business income of an insurance company" (35 ILCS 5/304(b)(1) (West 1994)), and section 304(c) includes the "[b]usiness income of a financial organization" (35 ILCS 5/304(c)(1) (West 1994)). Texaco-Cities maintains that, had the legislature similarly intended for section 304(d) to include all income from the transportation business, it could have so stated. The circuit court was persuaded by this argument, and concluded

that the insurance and financial provisions adopt an "entity" approach to apportionment, whereas the emphasis in section 304(d) is on an "activity" apportionment. The appellate court found the statutory language to be ambiguous.

Texaco-Cities' argument is unavailing. Each of the three sections at issue pertains to different industries and establishes unique formulas for each; the terminology used in one section has no bearing upon that applied in another. Further, where a statutory subsection has only one logical interpretation, there is no reason to resort to other subsections to create ambiguity. See 2A N. Singer, Sutherland on Statutory Construction § 47.02 (5th ed. 1992).

Under the interpretation advanced by Texaco-Cities, entities furnishing transportation services would have to apply one formula to apportion their income from providing services, and another for the remainder of their income from the transportation business. We can conceive of no reason why the legislature would have intended such a result. The aim of an apportionment formula is to divide business income among states based upon the taxpayer's business activity within each respective state. The one-factor "barrel-miles" formula of section 304(d)(2) was devised specifically to facilitate apportionment of income from the pipeline transportation industry; it is the best suited formula for that purpose. See generally 1 J. Hellerstein & W. Hellerstein, State Taxation, par. 10.01 (2d ed. 1993). Requiring the transportation industry to apply two different formulas to apportion its business income, based solely upon the type of business gain being apportioned, would be arbitrary and absurd.

The validity of our construction is underscored by the legislative history of the Act and the Department's regulations. The official commentary to section 304 notes

specifically that the special apportionment rules of sections 304(b), (c), and (d) were enacted in order to cover apportionment of the "special businesses" of "insurance companies, financial organizations, and persons furnishing transportation services, by pipeline or otherwise." Apportionment formulas for these particular businesses were omitted from the UDITPA. 1 Ill. Tax Reporter, pars. 12—200, at 1622, 14—006, at 1903, and 14—023, at 1912 (1987). The regulations of the Department similarly characterize the special apportionment formula as broadly applicable to "persons furnishing transportation services." 86 Ill. Adm. Code § 100.3310 (1996).

Texaco-Cities also urges that we reinstate the determination by the trial court that apportionment of the gain under section 304(d) amounts to a violation of Texaco-Cities' due process rights. The appellate court refused to consider this question, deeming it waived by Texaco-Cities' failure to raise it during the administrative proceedings. We agree.

In general, issues or defenses not placed before the administrative agency will not be considered for the first time on administrative review. See 735 ILCS 5/3—110 (West 1994); *Griffitts Construction Co. v. Department of Labor*, 76 Ill. 2d 99, 106 (1979). It is well-recognized that a litigant's right to question the validity of a statute is subject to waiver by act or omission. *Celotex Corp. v. Pollution Control Board*, 94 Ill. 2d 107, 120 (1983); *Jenisek v. Riggs*, 381 Ill. 290, 293 (1942); see *Caauwe v. Police Pension Board*, 216 Ill. App. 3d 313, 316 (1991). It is true that administrative agencies lack the authority to invalidate a statute on constitutional grounds or even to question its validity. *Moore v. City of East Cleveland*, 431 U.S. 494, 497 n.5, 52 L. Ed. 2d 531, 536 n.5, 97 S. Ct. 1932, 1934 n.5 (1977). Nonetheless, it is advisable to assert a constitutional challenge on the record before the administrative tribunal, because

administrative review is confined to the proof offered before the agency. Such a practice serves the purpose of avoiding piecemeal litigation and, more importantly, allowing opposing parties a full opportunity to present evidence to refute the constitutional challenge. See *In re Marriage of Rodriguez*, 131 Ill. 2d 273, 279 (1989). In accordance with these principles, then, we hold as waived Texaco-Cities' constitutional challenge to the application of section 304(d)(2) in this case.

We recognize that waiver is an admonition to the parties rather than a limitation on this court's jurisdiction, and that it may be relaxed in order to maintain a uniform body of precedent, or where the interests of justice so require. *American Federation of State, County & Municipal Employees, Council 31 v. County of Cook*, 145 Ill. 2d 475 (1991). However, a review of the record establishes that this is not such a case.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the appellate court.

*Affirmed.*

JUSTICE BILANDIC, dissenting:

I respectfully dissent. The relevant facts are undisputed. Texaco-Cities was a company principally engaged in the business of transporting petroleum products by pipeline. During the 1983 tax year, Texaco-Cities sold major segments of its pipeline assets and associated real estate. The pipelines sold had serviced only two refineries and those refineries had ceased operations. As a result of the sale, Texaco-Cities retained no pipelines in Illinois and reduced its total pipeline miles by nearly 90%. Also as a result of the sale, Texaco-Cities ceased its business of transporting petroleum products by pipeline in Illinois. These facts clearly demonstrate that this sale was an extraordinary event for Texaco-Cities,

essentially closing down its business in a specific geographic region. Under the plain language of section 1501, the gain from this extraordinary sale constitutes nonbusiness income. Even accepting the majority's conclusion that section 1501(a)(1) encompasses two, alternate tests for "business income," the gain in this case does not constitute business income.

The Department concedes that the gain from the sale of the pipeline does not qualify as business income under the first alternate test, the "transactional test." Rather, the Department contends that the gain qualifies as business income under the "functional test" derived from the second clause of section 1501(a)(1). That clause provides that business income includes "income from tangible and intangible property if the *acquisition, management, and disposition* of the property constitute *integral parts of the taxpayer's regular trade or business operations*." (Emphasis added.) 35 ILCS 5/1501(a)(1) (West 1994). The majority disregards the plain language of this clause to reach the conclusion that the gain from the sale in this case constitutes business income.

The majority holds that, to satisfy the functional test for business income, the property that is sold must simply be property that was " 'used by the taxpayer in its regular trade or business operations.' " 182 Ill. 2d at 269, quoting *National Realty & Investment Co. v. Department of Revenue*, 144 Ill. App. 3d 541, 554 (1986). That is not, however, what section 1501(a)(1) says. The second clause of section 1501(a)(1) plainly requires that the "acquisition, management, *and disposition*" of the property constitute "integral parts" of the taxpayer's "regular" business, not simply that the property was "used" in the taxpayer's regular business. (Emphasis added.) 35 ILCS 5/1501(a)(1) (West 1994). Thus, it is not the use of the property in the business which is the determining factor under the statute. Rather, the stat-

ute requires that the disposition which gives rise to the income constitute an integral part of the taxpayer's regular business operations. If the legislature had intended to include as business income all gain from the sale of any property "used" by the taxpayer in the regular course of its business, it could have easily written the statute to say so. The legislature chose not to use such language. The majority's holding in this case does not interpret the statutory language, it rewrites it. As noted by one commentator, in criticizing the interpretation of the UDITPA definition here adopted by the majority:

> "The words 'integral,' 'regular,' and 'operations' must be taken into account in analyzing the existence of business income. Merely examining whether an asset produced business income while owned by the taxpayer effectively ignores this very important part of the statute.
>
> *** [E]ven under the so-called functional test, the actual disposition transaction must be an integral part of the taxpayer's regular trade-or-business operations. The statute specifically requires that the 'acquisition, management, *and* disposition of the asset' must be an integral part of the taxpayer's regular trade-or-business operations." (Emphasis in original.) D. Lisonbee, State of the Law of Nonbusiness Gain, 7 J. St. Tax. 333, 335-36 (1989).

A number of decisions from other jurisdictions have interpreted and applied the UDITPA definition of business income in accord with its plain language. The Supreme Court of Pennsylvania reached this conclusion on remarkably similar facts in *Laurel Pipe Line Co. v. Commonwealth of Pennsylvania*, 537 Pa. 205, 642 A.2d 472 (1994). In that case, Laurel Pipe Line Company (Laurel) was in the business of transporting petroleum products by p'peline. Laurel operated a pipeline from Philadelphia to Pittsburgh and another pipeline from Pennsylvania to Ohio (the Ohio pipeline). As a result of shifting distribution patterns, Laurel discontinued operation of the Ohio pipeline and later sold the pipeline along with related assets. Laurel classified the

$3,766,047 gain from the sale of the Ohio pipeline as nonbusiness income.

The Pennsylvania Supreme Court, applying the UDITPA definition of business income, agreed that Laurel's gain from the sale was nonbusiness income. The court noted that the statutory definition encompassed two tests, the transactional test and the functional test. After concluding that the gain did not qualify as business income under the transactional test, the court considered whether the gain should be classified as business income under the functional test. The court emphasized that the statutory definition required that the " 'acquisition, management *and disposition* of the property constitute integral parts of the taxpayer's *regular* trade or business operations.' " (Emphasis in original.) *Laurel Pipe Line*, 537 Pa. at 211, 642 A.2d at 475, quoting 72 Pa. Stat. § 7401(3)(2)(a)(1)(A). The court held that, under this definition, the gain from the sale was not business income, reasoning that:

> "[T]he pipeline was not disposed of as an integral part of Laurel's regular trade or business. Rather, the effect of the sale was that the company liquidated a portion of its assets. This is evidenced by the fact that the proceeds of the sale were not reinvested back into the operations of the business, but were distributed entirely to the stockholders of the corporation. Although Laurel continued to operate a second, independent pipeline, the sale of the [Ohio] pipeline constituted a liquidation of a separate and distinct aspect of its business." *Laurel Pipe Line*, 537 Pa. at 211, 642 A.2d at 475.

The court went on to conclude that the sale of the pipeline could be characterized as a "partial liquidation which has changed the structure of the taxpayer's business." *Laurel Pipe Line*, 537 Pa. at 214, 642 A.2d at 477. Based on this reasoning, the Pennsylvania Supreme Court held that the gain from the sale was nonbusiness income, reversing the lower court's decision to the contrary. Notably, in the administrative proceedings in the

case at bar, the Department relied heavily on the lower court's decision in *Laurel Pipe Line*, arguing that the case was "perhaps directly on point." Likewise, the decision of the administrative law judge in this case relied on the lower court's decision in *Laurel Pipe Line*, concluding that it presented the "identical situation."

Similar facts were also presented in *McVean & Barlow v. New Mexico Bureau of Revenue*, 88 N.M. 521, 543 P.2d 489 (1975), a decision relied upon in *Laurel Pipe Line*. In *McVean*, the taxpayer was in the business of laying pipelines of two varieties, small diameter and large diameter. As part of a corporate reorganization, the taxpayer liquidated its large diameter pipeline business. The New Mexico Court of Appeals, again applying the UDITPA definition of business income, held that this gain was properly classified as nonbusiness income. In so holding, the court noted that the facts indicated that this transaction was "very unusual" for the taxpayer and "changed the geographical environment of where [the taxpayer's] business could operate." The court further noted that the taxpayer was not in the business of buying and selling pipeline equipment. The court found that the transaction at issue was a partial liquidation of the taxpayer's business and a total liquidation of the taxpayer's large diameter pipeline business. Accordingly, the sale did not constitute an integral part of the regular trade or business operations of the taxpayer and the gain derived therefrom was not business income. *McVean*, 88 N.M. at 524, 543 P.2d at 492.

Similarly, in *Phillips Petroleum Co. v. Iowa Department of Revenue & Finance*, 511 N.W.2d 608 (Iowa 1994), the Supreme Court of Iowa held that a petroleum corporation's sale of approximately $2 billion in oil and gas reserves and related assets did not produce business income under the UDITPA definition. The sale was accomplished as part of a plan of capital restructuring to

avoid a hostile takeover. The court began its analysis by noting that a number of jurisdictions had determined that the statutory language encompassed two alternate tests. Without deciding whether the statute encompassed the functional test in addition to the transactional test, the court determined that the income from the sale would not constitute business income under either test. In addressing the functional test, the *Phillips Petroleum* court reasoned that this test was intended to encompass income derived from the disposal of fixed assets by taxpayers who emphasize the trading of assets as an integral part of regular business. Accordingly, because the taxpayer owned the disposed assets for purposes of petroleum production, not for trading purposes, the gain from the sale of those assets was not business income. *Phillips Petroleum*, 511 N.W.2d at 610; see also *General Care Corp. v. Olsen*, 705 S.W.2d 642, 646 (Tenn. 1986) ("the drafters' use of the conjunction 'and' clearly indicates that the disposition, as well as the acquisition and management of property must be an integral part of the taxpayer's regular trade or business operations"); *Western Natural Gas Co. v. McDonald*, 202 Kan. 98, 446 P.2d 781 (1968) (gains from oil company's sale of oil and gas leases were not business income because the disposition giving rise to the income did not constitute an integral part of the company's regular trade or business operations).

The majority cites to no decision which finds a gain to constitute business income under factual circumstances similar to the case at bar. The two decisions primarily relied upon by the majority, *Ross-Araco Corp. v. Commonwealth, Board of Finance & Revenue*, 544 Pa. 74, 674 A.2d 691 (1996), and *District of Columbia v. Pierce Associates, Inc.*, 462 A.2d 1129 (D.C. 1983), are both factually distinguishable. In *Ross-Araco*, the court held that the gain from the taxpayer's sale of a tract of

land was *not* business income under either the transactional or the functional test. *Ross-Araco*, 544 Pa. at 85, 674 A.2d at 696-97. In so holding, the court cited with approval its prior decision in *Laurel Pipe Line*. In *Pierce Associates*, the court held that insurance proceeds the taxpayer received for flood damage to its manufacturing facility could constitute business income if they represented a gain to the taxpayer. It is true, as the majority asserts, that both decisions stated that the functional test for business income may be satisfied merely by showing that the property was used as an integral part of the taxpayer's business. In reaching this interpretation, however, those decisions, like the majority in this case, contradict the plain language of the statute. As explained by the Tennessee Supreme Court in rejecting this interpretation of the statute:

> "[This interpretation] disregards the statute's clear grammatical structure by attempting to make the word 'property' the subject of the clause upon which [the functional test is based]. The literal terms of the statute cannot be read to make the integral role of an asset in the taxpayer's business the controlling factor by which business earnings are identified without doing violence to the elementary rules of grammar." *General Care*, 705 S.W.2d at 648.

The majority also finds support for its conclusion in the comments to the UDITPA. 182 Ill. 2d at 270-72. Such interpretive aids cannot, however, be employed to reach an interpretation that is contrary to the plain language of the statute. Where the intent of the legislature may be ascertained from the plain language of a statutory provision, that language must be given effect without resort to other aids for construction. See *DiFoggio v. Retirement Board of the County Employees Annuity & Benefit Fund*, 156 Ill. 2d 377, 382 (1993). The plain language of section 1501(a)(1) classifies gain from the sale of property as business income only if the acquisition, management *and disposition* of the property were

integral parts of the taxpayer's regular business operations. There is no rule of construction which allows a court to declare that the legislature did not mean what the plain language of the statute imports. *DiFoggio*, 156 Ill. 2d at 382-83. The majority's attempt to ascribe a meaning to section 1501(a)(1) that contradicts the plain language of the statute is improper.

Accorded its proper construction, section 1501(a)(1) would not encompass the gain from the sale at issue in this case. Undeniably, the sale of nearly 90% of Texaco-Cities' pipeline assets, entailing the complete cessation of its pipeline transportation business in Illinois, was not an "integral part" of Texaco-Cities' "regular trade or business operations." Texaco-Cities was in the business of transporting petroleum products, not the business of disposing of 90% of its pipelines. The facts reveal that this sale was an extraordinary event, similar to the partial liquidations identified in *Laurel Pipe Line* and *McVean*. Accordingly, under the plain language of section 1501, the gain from that sale is nonbusiness income and must be allocated and taxed as such.

I therefore dissent from the majority's holding that the gain from Texaco-Cities' sale of the pipeline assets constitutes business income.

JUSTICES McMORROW and NICKELS join in this dissent.