PITTMAN, Judge.
Kimberly-Clark Corporation (“KC”) and Kimberly-Clark Worldwide, Inc. (“KCW”), appeal from a judgment of the Montgomery Circuit Court classifying derived income from the sale of an Alabama-based pulp- and paper-manufacturing facility known as the Coosa Mill and its adjacent timberlands known as the Coosa Timber-lands as “nonbusiness” income.
During the pertinent tax years at issue (1996-1998), KC was primarily engaged in the manufacture and sale paper-related consumer products. However, KC has, over the years, founded, acquired, and sold numerous other subsidiary businesses engaged in activities other than manufacturing and selling paper-related consumer products. During 1996-98, KC and its subsidiaries operated in 42 countries, employed approximately 60,000 employees, and generated annual sales of approximately $12 billion to $13 billion.
In 1962, KC purchased both the Coosa Mill and the Coosa Timberlands. The Coosa Timberlands consisted of 875,000 acres of timber. The Coosa Mill processed the raw material, or timber, taken from the Coosa Timberlands into a pulping slurry, which was then fed through spraying apparatus into a machine in order to make paper.
KC changed its corporate “strategy” in the early 1990s and decided to adopt one that was centered on its consumer-products business lines. KC started divesting itself of some businesses that did not, in its view, fit that strategy and would not help KC achieve its strategic goals; KC then started acquiring businesses that it believed would further its goals. KC determined that it would reduce its dependence on pulp produced in the United States from 80% to 30% but that it would not eliminate its use of United States-produced pulp entirely.
KC acquired Scott Paper Company, Inc. (“Scott Paper”), which became a wholly owned subsidiary of KC, in December 1995. Scott Paper’s name was subsequently changed to Kimberly-Clark Tissue Company (“KCTC”). In that transaction, KC similarly acquired Scott Worldwide, Inc. (“SWI”), a wholly owned subsidiary of Scott Paper. At that time, SWI controlled 995,000 acres of timberland in the Canadian province of Nova Scotia.
In November 1996, KC formed KCW as a subsidiary of KCTC. KCWs functions were 1) to manage and hold various intangible properties for KC such as patents, trademarks, and foreign-corporation equity investments; 2) to manufacture and sell paper-related products to KC for packaging and resale; and 3) to hold title for the benefit of KC to real property that contained timber. KCW similarly fulfilled such functions for several of KC’s affiliated entities: for instance, it managed the manufacturing of paper-related products at KC’s Utah and California mills and it held and managed substantially all the domestic and foreign timberlands owned by KC or its affiliated entities. KCW then merged with SWI and, as a result of that merger, KCW acquired the title to the 995,000 acres of Canadian timberland and to the Coosa Timberlands. The SWI employees who previously had overseen the Canadian timberland continued to oversee that timberland for KCW, and KCW contracted for KC employees to oversee the Coosa Timberlands.
*137 During the pertinent tax years of 1996-98, KCW engaged in a total of 30 like-kind exchanges and cash sales of timber. The exchanges and sales each involved from 800 to 1,500 acres of timberland. KCW similarly acquired approximately 520,000 acres of timberland in South Alabama (“the Mobile timberland”) in 1998. It sold the Mobile timberland to an unrelated party in 1999.
As part of its long-term strategy, KC determined that the Coosa Mill and the Coosa Timberlands did not build on KC’s strengths. The Coosa Mill and the Coosa Timberlands were subsequently sold to an unrelated party in March 1997 for approximately $600 million. KCW received $350 million for the Coosa Timberlands, and KC received the balance of $250 million for the Coosa Mill. KC used its gross receipts from the sale either to acquire other businesses or to repurchase its own stock. KCW engaged in seven like-kind exchanges of timberland in 1996, three in 1997, and seven in 1998.[1]
In addition, KC acquired and disposed of various other businesses or business segments during the 1990s in furtherance of its corporate strategy. KC acquired five non-pulp/paper-related businesses and sold nine such businesses during the pertinent years. Moreover, KC sold two pulp and paper mills in the early 1990s and sold a second mill, in addition to the Coosa Mill, during the 1996-1998 tax years. However, KC retained and operated seven pulp and paper mills during those years, and it acquired five more paper mills after those years.
KCW similarly entered into a number of transactions between 1996 and 1998. Other than the sale of the Coosa Timberlands, KCW sold 2 parcels of timberlands in 1996, 10 in 1997, and 1 in 1998, for a total of 13 sales of different timberland tracts.
KC and KCW reported the gross receipts from the sale of the Coosa Mill and the Coosa Timberlands, as apportionable business income on their respective 1997 Alabama corporate income-tax returns. They similarly excluded the gross receipts from their respective apportionment sales factors pursuant to a “special rule” promulgated by the Alabama Department of Revenue (“the Department”), which states that if “substantial amounts of gross receipts arise from an incidental or occasional sale of a fixed asset used in the regular course of the taxpayer’s trade or business, those gross receipts shall be excluded from the sales factor.” See Ala. Admin. Code (Dept. Of Revenue), r. 810-27-l-4-.18(c)(l) (emphasis added). The Department initially accepted KC’s and KCWs classification of the gross receipts as apportionable business income; however, the Department disallowed the exclusion of the gross receipts from the sales factors pursuant to the special rule. It similarly made other adjustments that have not been contested. The Department notified KC that KC was due a reduced tax refund of $147,649 for the subject years and billed KCW for additional taxes and interest in the amount of $3,372,129.
KC and KCW filed a petition for an administrative review by the Department, arguing that the gross receipts from the sale of the Coosa Mill and the Coosa Tim-berlands were business income then those receipts should be excluded from their sales factors pursuant to the special rule. In the alternative, KC and KCW argued, that the gross receipts constituted non-business income and thus should be wholly allocated to Texas, their “state of commercial domicile.” In ruling on that petition, *138 the Department accepted KC’s and KCW’s alternative argument that the gross receipts were nonbusiness income. However, instead of allocating the income to Texas, the Department allocated that income to Alabama pursuant to Ala.Code 1975, § 40-27-1, art. IV, ¶ 6(a). The Department consequently assessed KC and KCW taxes in the amount of $7,382,559 and $13,593,834, respectively.
KC and KCW appealed from the assessment to the Department’s Administrative Law Division. KC and KCW argued that their argument that the gross receipts from the sale were nonbusiness income was based on incomplete information and was incorrect. Before the administrative law judge (“ALJ”), KC and KCW asserted that the gross receipts were actually business income because the sale had been made in the regular course of business. In support of their position, KC and KCW emphasized that (1) the gross receipts had been reinvested in business-related activities; (2) they had filed state income-tax returns classifying the gross receipts as business income in states in which they did business other than Alabama;[2] and (3) the sale did not liquidate either company. KCW claimed that it had actively managed the Coosa Timberlands. KC and KCW also continued to assert that the gross receipts should be excluded from their apportionment sales factors pursuant to the special rule.
The Department, before the ALJ, argued that the Coosa Mill and the Coosa Timberlands sale had produced nonbusiness income because, it said, the sale had involved noncore divisions of KC, the sale had been extraordinary in nature, and the sale was not made in the regular course of business. The Department pointed out that KC had reported the sale as an “extraordinary item” for financial accounting purposes. The ALJ rejected the Department’s argument, citing Exxon Corp. v. Department of Revenue of Wisconsin, 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980), for the proposition that a company’s internal accounting techniques are not binding on a state for tax purposes. After considering the evidence, the ALJ entered an order agreeing with the classification by KC and KCW of the gross receipts from the sale of the Coosa Mill and the Coosa Timberlands as business income, but it rejected the application of the exception in the Department’s special rule to that income.
The Department appealed from the ALJ’s order to the Montgomery Circuit Court, contending that the gross receipts from the sale of the Coosa Mill and the Coosa Timberlands were not business income. KC and KCW cross-appealed from the order, contending that the special rule exception applied. The two appeals were consolidated in the circuit court. The parties stipulated to the admission into evidence of the record and the transcript made before the ALJ.
The circuit court held a hearing at which only counsel’s arguments were presented. The circuit court reversed the ALJ’s order, classifying the gross receipts from the sale of the Coosa Mill and the Coosa Tim-berlands as nonbusiness income (as contended by the Department), thereby upholding the Department’s final assessment. The circuit court did not reach the issue of the potential application of the special rule because its determination that the gross receipts from the sale of the Coosa Mill and the Coosa Timberlands were nonbusi *139 ness income rendered the potential applicability of the special rule immaterial.
KC and KCW timely appealed. The issue presented in this appeal is whether the gross receipts from the sale of the Coosa Mill and the Coosa Timberlands amounted to business income.
In Bean Dredging, L.L.C. v. Alabama Department of Revenue, 855 So.2d 513 (Ala.2003), the Alabama Supreme Court thoroughly set out an appellate court’s standard of review in appeals from administrative proceedings before the Department:
“The circuit court reviews de novo an order of an administrative law judge in the State Department of Revenue; however, the order is presumed prima facie correct and the burden is on the appealing party to show otherwise. § 40-2A-9(g)(2), Ala.Code 1975.
“[The appellate court’s] standard of review is different from that applied by the circuit court in reviewing an administrative law judge’s order. When reviewing a case in which the trial court sat without a jury and heard evidence in the form of stipulations, briefs, and the writings of the parties, [an appellate] court sits in judgment of the evidence; there is no presumption of correctness. Old Southern Life Ins. Co. v. Williams, 544 So.2d 941, 942 (Ala.1989); Craig Constr. Co. v. Hendrix, 568 So.2d 752, 756 (Ala.1990). When [an appellate] court must determine if the trial court misapplied the law to the undisputed facts, the standard of review is de novo, and no presumption of correctness is given the decision of the trial court. State Dep’t of Revenue v. Gamer, 812 So.2d 380, 382 (Ala.Civ.App.2001); see also Ex parte Graham, 702 So.2d 1215 (Ala.1997).”
855 So.2d at 516-17. In this case, the circuit court received no testimonial evidence, basing its decision upon the briefs and arguments of the parties’ attorneys and the record of the hearing in front of the ALJ. Thus, we must sit in judgment of the evidence, and the circuit court’s ruling carries no presumption of correctness.
Alabama has adopted the Multistate Tax Compact (“MTC”), see Ala.Code 1975, § 40-27-1, which was intended to create a uniform system by which states can accurately identify and fairly apportion taxes with respect to income attributable to multiple states. The tax attributable to each state is based on the allocation and apportionment rules established in 1957 by the Uniform Division of Income for Tax Purposes Act (“UDITPA”). Ex parte Uniroyal Tire Co., 779 So.2d 227, 230 (Ala.2000). Under the MTC and UDITPA, income is divided into business income and nonbusiness income. A multistate corporation’s business income is apportioned among the states in which the corporation operates, generally in accordance with an equally weighted three-factor formula encompassing sales, payroll, and property. Ala.Code 1975, § 40-27-1, art. IV, ¶ 9. Nonbusiness income, however, is wholly allocated to a single state: although, in certain instances, such income is allocated to the corporation’s “state of commercial domicile,” the income from the sale of real property is allocated to the state in which the property is located. Ala.Code 1975, § 40-27-1, art. IV, ¶¶ 5-8.
During the tax years in issue, “business income” was defined in Ala.Code 1975, § 40-27-1, Art. IV, ¶ 1(a), as follows:
“ ‘[Ijncome arising from transactions and activity in the regular course of the taxpayer’s trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpay *140 er’s regular trade or business operations.”
The uniformity sought by the MTC has been compromised by the judicial disagreement of different states over the definition of “business income.” Two tests, the “transactional test” and the “functional test,” have developed as a result. The Alabama Supreme Court addressed this issue thoroughly in Ex parte Uniroyal, supra.
In Ex parte Uniroyal, the record revealed that Uniroyal Tire Company had entered into a partnership with the B.F. Goodrich Company. Both corporations transferred all of their assets to the partnership, each receiving a 50% partnership interest in return. Thus, Uniroyal Tire Company’s only asset was its partnership interest, and between the 1986 and 1989 tax years, Uniroyal Tire Company treated the income received from the partnership as business income. Ultimately, Uniroyal Tire Company’s partnership interest was liquidated; Uniroyal Tire Company sold its entire partnership interest for approximately $260,600,000 and realized a capital gain of $99.7 million. On its 1990 Alabama tax return, Uniroyal Tire Company treated the $99.7 million as nonbusiness income. The Department rejected that treatment, maintaining that the $99.7 million was business income, and it assessed corporate income tax accordingly. Uniroyal Tire Company sought review of that assessment, and the contest ultimately reached the Alabama Supreme Court.
The Alabama Supreme Court took the opportunity to discuss the concept of “business income” and the two developing tests, the transactional test and the functional test, in depth, stating:
“Proponents of the transactional test find it ‘rooted in the statutory phrase, “earnings arising from transactions and activity in the regular course of the taxpayer’s trade or business.” ’ General Care [Corp. v. Olsen ], 705 S.W.2d [642], 644 [ (Tenn.1986) ] (emphasis added in General Care). ‘Thus, under the transactional test, the “controlling factor by which business income [is defined] is the nature of the particular transaction giving rise to the income.” ... The frequency and regularity of similar transactions and the former practices of the business are pertinent considerations.’ Id. (quoting [Western Natural Gas Co. v.] McDonald, [202 Kan. 98, 446 P.2d 781, 788 (1968) ]).
“Other courts construing the same language have concluded that their statute also contains an alternative test, which is popularly known as the ‘functional’ test. See, e.g., Pledger v. Getty Oil Exploration Co., 309 Ark. 257, 881 S.W.2d 121 (1992); Texaco-Cities Serv. Pipeline Co. v. McGaw, 182 Ill.2d 262, 230 Ill.Dec. 991, 695 N.E.2d 481 (1998); and Laurel Pipe Line Co. v. Commonwealth, 537 Pa. 205, 642 A.2d 472 (1994); cf. Simpson Timber Co. v. Department of Revenue, 326 Ore. 370, 953 P.2d 366 (1998) (Durham, J., concurring). Proponents of the functional test find it rooted in that second clause of the statute, which reads: ‘and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer’s regular trade or business operations.’ ‘More broadly [than under the transactional test], under the functional test, all gain from the disposition of a capital asset is considered business income if the asset disposed of was “used by the taxpayer in its regular trade or business operations.” ’ Texaco-Cities Serv., 182 Ill.2d at 269, 230 Ill.Dec. 991, 695 N.E.2d at 484 (emphasis added). ‘Under the functional test ..., the extraordinary nature or infre *141 quency of the sale is irrelevant.’ Id., 182 Ill.2d at 269, 230 Ill.Dec. 991, 696 N.E.2d at 484. Proponents of this view hold that ‘income constitutes business income if either one of the above tests is met.’ Id. (emphasis added).”
779 So.2d at 230-31. The Alabama Supreme Court held that the broader functional test would authorize taxation that Ala.Code 1975, § 40-27-1, art. IV, 111(a), does not; therefore, the Court held, to the extent that it did so, it conflicted with the statute. The Alabama Supreme Court, therefore, rejected the functional test and held that the definition of “business income” envisioned the application of the transactional test.
Moreover, in expounding on the language of the statute supporting the use of the transactional test, the Alabama Supreme Court in Ex parte Uniroyal defined the word “regular” as used in that statute, stating:
“ ‘Regular’ has been defined as ‘steady or uniform in course, practice, or occurrence: not subject to unexplained or irrational variation: steadily pursued; orderly, methodical’; even as ‘returning, recurring, or received at stated, fixed or uniform intervals ...; functioning at proper intervals.’ Webster’s Third New International Dictionary of the English Language Unabridged 1913 (1971) (emphasis added). Clearly, the word, ‘regular’ in the phrase ‘regular course of the taxpayer’s trade or business’ refers to an ongoing business concern.”
779 So.2d at 236.
After thoroughly explaining the differences between the transactional test and the functional test, Ex parte Uniroyal concluded:
“We express no opinion as to how an amendment of the statute to substitute the disjunctive ‘or’ for the conjunctive ‘and’ might affect cases involving true liquidations. However, we are clear to the conclusion that under our statute as it is currently constituted, true liquidations do not generate ‘business income’ within the meaning of § 40-27-1, Art. IV, l.(a).”
779 So.2d at 238.
Other jurisdictions have offered further guidance in determining what constitutes “business income.” In Atlantic Richfield Co. v. State of Colorado, 198 Colo. 413, 601 P.2d 628 (1979), the Colorado Supreme Court, in applying the transactional test, ruled that even though Atlantic Richfield’s primary business was the exploration for and production of oil and natural gas, the capital gains and interest derived from selling various assets was business income. The court held that such income was business income resulting from transactions in the regular course of Atlantic Richfield’s business because Atlantic Richfield, as part of its business operations, had regularly engaged in major acquisitions and dispositions; those acquisitions and dispositions of assets were systematic business practices that generated business income even though they were not part of its primary business.
In Welded Tube Co. Of America v. Commonwealth of Pennsylvania, 101 Pa. Commw. 32, 515 A.2d 988 (1986), the court concluded that the capital gains realized from the buying and selling of manufacturing plants were business income under both the transactional test and the functional test. The taxpayer had purchased property in 1957 in Philadelphia as a site for a manufacturing facility. It then purchased 13 additional contiguous parcels of land between 1958 to 1963 for the expansion of that plant. In addition, in 1974 the taxpayer acquired 35 acres of land in Alabama, which was to be the site of a new manufacturing facility; that facility was never constructed. The taxpayer ulti *142 mately sold the Philadelphia facility in 1977, after it had become unprofitable, and it sold the Alabama property in 1982.
Even though Pennsylvania’s revenue authority argued that the taxpayer was not regularly engaged in the buying and selling of manufacturing plants and that the taxpayer’s disposition of real property only twice in its 30-year corporate history could not be a “systematic and recurrent” business practice so as to satisfy the test set forth in Atlantic Richfield, swpra, and to allow the income generated from those transactions to be considered business income, the court stated that “it makes no difference whether income derives from the main business, the occasional business or the subordinate business so long as the income arises in the regular course of business.” Welded Tube, 101 Pa. Commw. at 44, 515 A.2d at 994. The court concluded that it was a regular practice of the taxpayer to acquire property in the expansion of its business of manufacturing welded tubing and that such purchases and sales of property constituted an integral part of its business operations. In short, moneys derived from those transactions, according to Welded Tube, generated business income.
In PPG Industries, Inc. v. Department of Revenue, 328 Ill.App.3d 16, 765 N.E.2d 34, 262 Ill.Dec. 208 (2002), the court addressed whether “buying and selling of other businesses”- was part of a taxpayer’s “regular business activity.” Id. at 28-29, 765 N.E.2d at 45, 262 Ill.Dec. at 219. PPG Industries, Inc. (“PPG”), excluded the gain on the sale of a Michigan-based oil and gas subsidiary on its corporate income-tax return as having been nonbusiness income. The Illinois court held that the proceeds of the sale of the subsidiary, under either the transactional test or the functional test, constituted business income. Id. at 28, 765 N.E.2d at 44-45, 262 Ill.Dec. at 218-19. The court held that, under the transactional test, the proceeds of the sale were business income because PPG was in the business of buying and selling other businesses. PPG had acquired several businesses in 1987; PPG’s strategic performance objectives included selling several businesses. The Illinois court concluded that PPG had engaged in the acquisition and divestiture of other companies in the regular course of PPG’s business.
In this case, KC is, among other things, in the business of selling paper products whose manufacture requires raw material processed in mills and taken from timber-lands. As timberlands are depleted, pulp-manufacturing facilities may become unprofitable. In addition, costs associated with paper mills and timberlands may cause a change in corporate strategy, taking the corporation in a new direction. It is not hard to imagine that the selling and acquisition of paper mills and timberlands, especially by a corporation that, among other things, sells paper products, would generate earnings arising from transactions and activities in the regular course of the corporation’s trade or business and would be an ongoing business concern. See Ex parte Uniroyal, 779 So.2d at 230-31, 236.
Moreover, KC bought and sold major businesses and business components in the regular course of business during the 1990s pursuant to its long-term corporate strategy. Before that decade, KC had been widely diversified and had owned not only companies involved in the manufacture and sale of forest products, but also other companies, such as an airline. KC’s long-term strategy required KC to focus on its basic strengths, prompting it to acquire businesses that fit into that strategy and to sell businesses that did not. Although the sale of the Coosa Mill and the Coosa Timberlands may have been a large sale of a plant and of timberland, KC, *143 acting through KCW, regularly bought and sold paper plants and timberlands, businesses, and business components. In addition, the sale of the Coosa Mill did not end KC’s active involvement in the pulp/paper business; it owned and operated 7 pulp/paper mills throughout the period between 1996 and 1998, and, at the time of the hearing before the ALJ, it owned and operated 12 mills. Income similarly generated from regularly buying and selling businesses was held in Atlantic Rich-field, supra, to be business income under the transactional test espoused by our Supreme Court in Ex parte Uniroyal, when, as in this case, the pertinent taxpayer regularly engaged in major acquisitions and dispositions. Thus, under the authorities that we have discussed, the sale of the Coosa Mill and the Coosa Timberlands is properly deemed a systematic and recurrent business practice that produced business income.
We note that the Department argues that KCW was not engaged in the management of the Coosa Mill and the Coosa Timberlands, i.e., that it was not involved in the clearing of land and maintenance of roads in the Coosa Timberlands, and, therefore, the Department asserts that the transactional test should not apply to characterize the income KCW received from the sale as business income. KCWs management function, however, was to hold title to timberlands and to oversee the sales and acquisitions of timberlands. KCW’s primary purpose was to acquire and to dispose of timberlands in the regular course of its business through like-kind exchanges and cash sales, which required it to hold title to those properties for those purposes. During the tax years at issue, KCW acquired or sold 30 small tracts of timberland in addition to the Coosa Tim-berlands; moreover, KCW similarly acquired title to 520,000 acres of Mobile timberland in 1998 and sold that land in 1999, and, for all that appears in the record, it still owns and manages 995,000 acres of timberland in Canada. Thus, the management of titles, purchases, and sales of tracts of timberland are part of KCW’s regular business. See Ex parte Uniroyal, 779 So.2d at 230-31, 236.
Additionally, even if KC or KCW had not frequently engaged in the transactions discussed herein, the income from those transactions would still be considered business income. See Welded Tube, supra. In Welded Tube, the court held that a pipe manufacturer’s sale of a manufacturing facility resulted in business income, even though the manufacturer had bought and sold real property only twice in 30 years. The record indicated that KC and KCW had engaged in a number of business transactions during the 1996-1998 tax years alone.
Like the sales transactions by the taxpayers in Atlantic Richfield, PPG, and Welded Tube, the sale of the .Coosa Mill and the Coosa Timberlands was performed in the regular course of KC’s and KCW’s business. The buying and selling of businesses and manufacturing facilities was in furtherance of their primary business of manufacturing and selling paper and paper-related products and their overall corporate strategy.
Based on the foregoing, we reverse the judgment of the circuit court and remand this case with instructions to determine whether the “special rule” is or is not applicable to the business income earned by KC and KCW.
REVERSED AND REMANDED.
BRYAN, THOMAS, and MOORE, JJ., concur.
THOMPSON, P.J., concurs in the result, without writing.

. A "like-kind” exchange is an exchange of an asset for another similar asset. Cf. 26 U.S.C. § 1031 (defining that term for federal income-tax purposes).

. Business income is apportioned among the states in which the corporation does business. See Ala.Code 1975, § 40-27-1 art. IV, ¶ 9.