COBB, Chief Justice
(dissenting).
I respectfully dissent. I believe that the majority opinion fails to place proper emphasis on the number and type of transactions other than the sale of the Coosa properties and fails to properly characterize the nature of the transaction giving rise to the income that the Alabama Department of Revenue seeks to tax. Rather, I believe that the opinion by the Court of Civil Appeals correctly analyzed this transaction.
I recognize that the majority opinion will probably result in more revenue for the State of Alabama because, for corporate-tax purposes, a corporation’s “business income” is apportioned among all the states in which the corporation does business, but a corporation’s “nonbusiness income” from the sale of real property and other capital assets is allocated only to the state in which the property is located. It appears that Kimberly-Clark Corporation (“KC”) and Kimberly-Clark Worldwide, Inc. (“KCW”) (collectively “the companies”), have already paid the corporate tax attributable to the income from the sale of these assets to the other states in which they do business, and this decision will thus result in a double payment.
During the tax years in question, “business income” was defined as
“income arising from transactions and activity in the regular course of the taxpayer’s trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer’s regular trade or business operations.”
Ala.Code 1975, § 40-27-1, Art. IV, 1.(a). In Ex parte Uniroyal Tire Co., 779 So.2d 227 (Ala.2000), this Court approved a “transactional” rather than a “functional” test for determining whether income is “business income” for tax purposes. The Court stated:
“ ‘[Ujnder the transactional test, the “controlling factor by which business income [is defined] is the nature of the particular transaction giving rise to the income.” ... The frequency and regularity of similar transactions and the former practices of the business are pertinent considerations.’ ”
Uniroyal, 779 So.2d at 230 (quoting General Care Corp. v. Olsen, 705 S.W.2d 642, 644 (Tenn.1986), quoting in turn Western Natural Gas Co. v. McDonald, 202 Kan. 98, 101, 446 P.2d 781, 783 (1968)). In light of the transactional test adopted in Uniroyal, it is entirely appropriate to look at the companies’ sale of the Coosa properties as part of their ongoing business practice of acquiring and disposing of pulp mills and timber property. KC’s newly adopted corporate strategy was to reduce its internal pulp production from 80% to 30%, not to eliminate it altogether. Obviously, then, the companies would have to retain some timberland and some mills; one could assume that the companies were frequently buying and selling in order to obtain the most productive timber acreage and the most efficient mills — -in any ease, the turnovers were frequent enough that they should all be deemed “transactions and activity in the regular course of the taxpayer’s trade or business.” Ala.Code 1975, § 40-27-1, Art. IV, 1.(a). In 2002, *155 the companies owned 12 pulp mills; 5 mills were acquired between 1999 and 2002, and 4 mills had been sold before 1999. The Court of Civil Appeals in its opinion noted that, “[i]n November 1996, KC formed KCW as a subsidiary of KCTC [Kimberly-Clark Tissue Company].” 69 So.3d at 136; among KCW’s functions, the Court of Civil Appeals noted, was “to hold title to timber-lands and to oversee the sales and acquisitions of timberlands.” 69 So.3d at 143. The fact that KCW was formed primarily to acquire, manage, and sell timberlands indicates that transactions like the one at issue in this case were in the regular course of the taxpayer’s business.
The majority opinion focuses on the size and scope of the Coosa properties sale (including 375,000 acres of timberland) and the $600 million income generated from that sale, characterizing the sale as “extraordinary” because of those factors, likening the sale to a partial liquidation, as in Uniroyal; it ignores the fact that in 1998 the companies acquired 520,000 acres of timberland in Mobile, which they then sold in 1999. Nothing in Uniroyal indicates that in determining whether a transaction is “extraordinary,” one is to look at the size, scope, and price tag of the transaction; instead, it is the nature of the transaction that should be analyzed. See Uniroyal 779 So.2d at 231 (noting that under the functional test, which this Court disapproved, “ ‘the extraordinary nature or infrequency of the sale is irrelevant’ ” (quoting Texaco-Cities Serv. Pipeline Co. v. McGaw, 182 I11.2d 262, 269, 695 N.E.2d 481, 484, 230 Ill.Dec. 991, 994 (1998))). In contrast, under the transactional test, the nature and frequency of the companies’ acquiring and then selling timberland and pulp mills is highly relevant. The evidence was undisputed that the companies engaged in numerous transactions of the same nature, albeit smaller in size, scope, and price tag. The majority opinion states that KC listed the sale in its annual report as an “extraordinary gain.” Although the majority opinion acknowledges that “‘a company’s internal accounting techniques are not binding on a state for tax purposes’ ” (quoting the order of the administrative law judge), it goes on to use that characterization to support the conclusion that the sale was “extraordinary” and that it thus fell outside the “regular course of business.” That seems insupportable in the face of common practice. A company’s annual report is designed to give its creditors and shareholders a true picture of its financial position. A state’s corporate tax structure, on the other hand, is designed to allocate income equitably.
The majority opinion turns KC’s corporate strategy of reducing its internal pulp production from 80% to 30% on its head. Rather than analyzing the sale in this case as one in furtherance of the business of KC because it was in line with its new business strategy, the majority opinion analyzes the sale as incident to “a major shift in corporate strategy,” and thus “extraordinary.” 69 So.3d at 153. I conclude that such an approach is inconsistent with State law as expressed in Uniroyal, and I respectfully dissent.