THE COUNTY OF DU PAGE *et al.*, Petitioners, v. ILLINOIS LABOR RELATIONS BOARD, STATE PANEL, *et al.*, Respondents.

Second District   No. 2—06—0380

Opinion filed September 16, 2009.

Joseph E. Birkett, State's Attorney, of Wheaton (Thomas J. Stanfa and Lisa A. Hoffman, Assistant State's Attorneys, of counsel), for petitioner County of Du Page.

James Baird, James J. Powers, and Winnie Wong, all of Seyfarth Shaw LLP, of Chicago, for petitioner Du Page County Sheriff.

Lisa Madigan, Attorney General, of Chicago (Gary S. Feinerman, Solicitor General, and Jerald S. Post, Assistant Attorney General, of counsel), for respondent Illinois Labor Relations Board, State Panel.

Joseph R. Mazzone, of Schenk Duffy Carey Ford Mazzone Phelan & Clemens, of Joliet, for respondent Metropolitan Alliance of Police, Du Page County Sheriff's Police Chapter #126.

JUSTICE O'MALLEY delivered the opinion of the court:

This matter returns to us upon a remand by our supreme court. Previously, petitioners, the County of Du Page (County) and the Du Page County sheriff (Sheriff), sought, for at least the second time, administrative review of the certification of representative made by respondent Illinois Labor Relations Board, State Panel (Board), which

certified respondent Metropolitan Alliance of Police, Du Page County Sheriff's Police Chapter #126 (MAP), as the exclusive bargaining representative of some, but not all, sheriff's deputies employed by petitioners. Petitioners contended that the Board erred in its approval of the proposed bargaining unit by excluding nearly all deputies who were assigned to the Corrections Bureau of the Sheriff's office. Additionally, petitioners argued that the Board misinterpreted the statutory evidentiary requirements necessary to certify a representative under the majority interest provision of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/9(a—5) (West 2004)). We agreed with petitioners' statutory argument and vacated the certification of representative. *County of Du Page v. Illinois Labor Relations Board, State Panel*, 375 Ill. App. 3d 765 (2007). The supreme court reversed our decision and remanded the cause, instructing us to consider the previously unreached issues regarding the appropriateness of the bargaining unit certified by the Board. *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593 (2008). Pursuant to the supreme court's decision, we now consider whether the Board erred in excluding deputies assigned to the Corrections Bureau of the Sheriff's office from the bargaining unit.[1] For the reasons that follow, we affirm the determination of the Board.

## BACKGROUND

Although the background for this matter has been recounted previously (*County of Du Page v. Illinois Labor Relations Board, State Panel*, 358 Ill. App. 3d 174 (2005) (*County of Du Page I*); *County of Du Page v. Illinois Labor Relations Board, State Panel*, 375 Ill. App. 3d 765 (2007) (*County of Du Page II*); *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593 (2008) (*County of Du Page III*)), we nevertheless find it helpful once again to set forth the factual and procedural history to set the stage for the particular claims at issue in this case.

We first summarize the Sheriff's position statement, the offer of proof that petitioners submitted to the Board, and the evidence in the record. The offer of proof and the position statement delineated the Sheriff's view of the duties of his deputies. The Sheriff's office is headed by Sheriff John E. Zaruba. While the Sheriff's office is funded by the Du Page County Board (County Board), the Sheriff personally

---

[1]Petitioners also included an issue on appeal asserting that the representation petition in this case was filed prematurely because the petition from the previous case had not been finally resolved. Petitioners, however, expressly withdrew the issue from consideration in their reply brief and we do not address it further.

possesses the exclusive authority to assign and direct the deputies and other personnel under his authority. The Sheriff's office is administratively organized into three bureaus: the Administrative and Support Services Bureau, the Law Enforcement Bureau, and the Corrections Bureau.

Under the Illinois Counties Code, a sheriff may appoint deputies (55 ILCS 5/3—6008 (West 2004)) to "perform any and all the duties of the sheriff, in the name of the sheriff, and the acts of such deputies shall be held to be acts of the sheriff" (55 ILCS 5/3—6015 (West 2004)). Deputies below the rank of sergeant belong to the civil-service job classification of "deputy sheriff." A person seeking to become a Du Page County deputy sheriff may obtain an application from the Du Page County Merit Commission (Merit Commission), a three-member panel empowered by the County to recruit, test, and certify applicants for hiring and promotion within the Sheriff's office. In March 1999, the County Board amended the rules of the Merit Commission to create a single civil-service classification of "deputy sheriff," eliminating the distinction among deputies assigned to the different bureaus. The purpose behind the amendment was to bring the Merit Commission's testing requirements into line with the Sheriff's goal of employing "uni-deputies" who are qualified to work in any and all of the administrative divisions of the Sheriff's office.

Whenever a deputy is hired, he or she is given the same oath of office as any other deputy. The oath of office does not distinguish among the various job assignments in the Sheriff's office. Upon being sworn and assigned to a bureau, a deputy is provided with a copy of the Sheriff's general orders, and all deputies are expected to perform the duties and responsibilities described in the "Job Description" section of the general orders, including, according to petitioners:

> "(1) preserving and protecting life, property, and the right of all citizens to live in peace; (2) enforcing the laws of the State of Illinois and the County of Du Page in a fair and impartial manner; (3) serving and executing all legal process; (4) preventing crime and maintaining the safety and order of the citizens of Du Page County; (5) operating in a proactive manner to prevent criminal activity; (6) initiating and conducting investigations of criminal activity; (7) responding to calls for service; (8) identifying and arresting criminal offenders and persons wanted on warrants issued by the courts; (9) assisting with the prosecution of cases; and (10) transporting prisoners."

Petitioners note that the "job description" for a deputy sheriff makes no distinction among the specific job assignments within the Sheriff's office.

Each deputy is expected to enforce the law at all times, whether he or she is on or off duty. The regulation manual of the Sheriff's office provides:

"No Deputy, while on-duty, shall willfully fail to take all necessary and proper police action in accordance with the Du Page County Sheriff's Manual, other Departmental Written Directives and the Illinois Revised Statutes.

No Deputy shall fail to respond to and perform a police duty at any hour of the day or night, if they have the knowledge that a police emergency exists, whether or not they have been notified by a superior officer.

No Deputy, while off-duty, shall willfully fail to take necessary police action when they observes [sic] an offense which creates an immediate danger to persons or property located in Du Page County."

According to Zaruba, all of the deputies are obligated to enforce the law 24 hours a day, 7 days a week.

All deputies are issued identical uniforms, badges, and identification cards. These items do not vary according to the unit in the Sheriff's office to which a deputy is assigned. All of the deputies are paid according to the same salary schedule, which does not take into account a deputy's assignment. The same holds true for deputies holding the rank of corporal or detective. All deputies below the rank of sergeant receive the same benefits package and vacation allotment, neither of which depends on the deputy's job assignment within the Sheriff's office. Each deputy receives an annual performance evaluation using a universal evaluation form.

Each deputy, under Illinois law, must complete a required number of hours of "basic" and "firearms" training. Basic training is divided into "law enforcement" and "corrections" classifications, each of which requires a deputy to undergo a required number of hours of training within six months of being appointed a deputy. To be certified as a "law enforcement officer," a person must obtain at least 400 hours of approved training; to be certified as a "corrections officer," a person must obtain at least 200 hours of approved training; and to be certified as a "court security officer," a person must complete at least 40 hours of approved training.

"Firearms" training is mandated for all "peace officers." 50 ILCS 710/2 (West 2004). In order to possess and use a firearm in the course of his or her duties, a "peace officer" must complete 40 hours of approved firearms training. All three classifications of deputies—law enforcement, corrections, and court security—are deemed to be "peace officers" for purposes of firearms training.

In addition to the basic training, the Sheriff's office also provides supplemental training on a variety of topics. The supplemental training is made available to all deputies and does not depend on a deputy's assignment to one of the bureaus. Additionally, the training is not specifically tailored to the assignment of deputies; other than a few job-specific exceptions, it is taught in a "one-size-fits-all" manner. Some of the topics of the training are use of force, search/seizure/ arrest techniques, street gang activities, medical treatment, and Breathalyzer operation.

As noted above, the Sheriff's office is divided into three bureaus, and each bureau is responsible for specific operations within the Sheriff's office. A newly hired deputy will be assigned to one of the bureaus according to the overall needs of the Sheriff's office at that time. The new deputy will be trained pursuant to the State's and the Sheriff's requirements. After his or her assignment to one of the bureaus, the deputy may transfer to a different bureau if an opening is available.

The Administrative Bureau is responsible for managing: (1) the budget and expenditures of the Sheriff's office; (2) the office's contact with the State's Attorney in civil litigation matters; (3) data processing and records operations; (4) the crime laboratory and crime scene detectives; (5) the quartermaster's office; (6) the maintenance of the physical plant of the Sheriff's office; and (7) security in and around the county court buildings. The Administrative Bureau is composed of both sworn deputies and nonsworn civilian personnel. It is staffed with approximately 74 deputies below the rank of sergeant. The total number of deputies includes four deputy-detectives working in the office's crime laboratory. The remaining 70 deputies are assigned to duties in the Court Security Division. The Board determined that all of the deputies in the Administrative Bureau were "peace officers" and were properly included in MAP's proposed bargaining unit.

All of the deputies assigned to the Administrative Bureau take the same oath, wear the same uniform, and have the same powers to carry firearms and make arrests as any other deputy employed by the Sheriff. The duties performed by deputies assigned to the Administrative Bureau are described below.

The Crime Laboratory and Forensics Unit is within the jurisdiction of the Administrative Bureau. Four deputies are assigned as evidence technicians in this unit. The evidence technician deputies report to crime scenes and collect evidence to analyze in the crime laboratory. Typically, the deputies do not wear uniforms, although they are issued uniforms. The deputies are also issued weapons, which they wear as long as the weapons do not interfere with their investiga-

tions. The deputies are also issued unmarked vehicles (with lights and sirens), which are used to travel to crime scenes. The deputies work 10-hour shifts and 40-hour weeks. The deputies also participate in an on-call schedule in case their expertise is needed during off-duty hours. The evidence technicians spend about half of their worktime in the office or the lab, analyzing evidence, manning the property control room, or conducting training; they spend the other half of their worktime in the field. They possess the same powers to arrest citizens as all other deputies, and they regularly come into contact with members of the public.

The primary responsibility of the Court Security Division of the Administrative Bureau is to maintain the safety and security of the Du Page County courts. About 70 deputies are assigned to the division, and they work in and around the county's judicial office facility.

Each day, the deputies receive their assignments to one of five positions: courtroom security, master control, prisoner transport, entrance screening, or facility security. In the judicial office facility, the deputies are assigned posts through which they regularly rotate. A particular post will rotate weekly, daily, or hourly, depending on the workload demands.

Deputies assigned to the Court Security Division are trained to perform any job within the division. Deputies assigned to courtroom security physically inspect the courtrooms for weapons or contraband each day. Once within the courtrooms, they maintain order. Court Security deputies also escort jurors who are being sequestered and supervise the jurors once they have been sequestered. Deputies assigned to entrance screening operate the X-ray machines and metal detectors to screen all visitors to the courthouse. By these assignments, deputies are brought into frequent contact with the public. These assignments are also typically (but not exclusively) filled with deputies from the Corrections Bureau. To keep order and to present a visible deterrent, the deputies wear uniforms, some are armed, and they make arrests as needed.

Up to 12 deputies are assigned to the Rapid Action Team (RAT), which deals with emergency response. The RAT patrol covers the court hallways to prevent disturbances and keep order within the courthouse. The RAT patrol assignments are also typically filled with some deputies from the Corrections Bureau. The RAT deputies wear uniforms, carry firearms, and frequently come into contact with the public.

Two deputies are assigned on a rotating basis to the master control room. There, they operate the video surveillance of the facility. They also control the security doors for prisoner transport from the jail and

throughout the entire courthouse. The deputies assigned to the master control room wear uniforms and carry firearms, but must secure their weapons while in the control room.

Court Security deputies make arrests in and around the courthouse. The arrests occur when the deputies observe criminal conduct, when they learn of warrants for people known to be in the courthouse, or when judges issue arrest orders from the bench.

Deputies assigned to the Court Security Division of the Administrative Bureau and to the Corrections Bureau are given responsibility to provide security for the bond court, where arraignments and other proceedings are held apart from the courtrooms in the judicial office facility. Between three and five deputies from the Corrections Bureau work in the bond court on a daily basis. The bond court deputies have contact with the public and possess the same powers of arrest as other deputies. Throughout the course of a year, nearly every deputy in the Corrections Bureau will have worked in the bond court.

The prisoner transport detail employs between six and eight deputies from the Court Security Division. They transport prisoners from the Du Page County jail to holding cells and courtrooms in the judicial office facility for their court appearances. Several times during the day, the deputies (called "transport deputies" or "tunnel people") pick up a prisoner from the Corrections Bureau, escort the prisoner into the judicial office facility, place the prisoner in a holding cell until his hearing commences, present the prisoner to the court, and return the prisoner to the jail. Up to 200 prisoners are escorted in a typical day.

The "tunnel people" wear uniforms identical to the other Sheriff's deputies, along with badges, radios, and handcuffs. They have the same powers of arrest and detention as other deputies. They do not carry firearms while escorting prisoners, but otherwise, they are indistinguishable from other deputies. The transport deputies are also responsible for staffing the master control room. Due to the nature of their duties, the transport deputies typically work their entire shift without coming into contact with the public.

The Law Enforcement Bureau contains several divisions involved in crime detection and prevention. There are 115 sworn deputies and 26 civilian employees in the Law Enforcement Bureau. The Board determined that all of the deputies in the Law Enforcement Bureau were "peace officers" and were properly included in MAP's proposed bargaining unit.

Most of the deputies in the Law Enforcement Bureau serve in the Patrol Division. A deputy in the Patrol Division works one of three shifts, or "watches." Deputies in the Patrol Division are tasked with patrolling neighborhoods, businesses, residential subdivisions, and the

communities of Du Page County in order to enforce the law and protect the public. The deputies also are responsible for making traffic stops as necessary. Patrol Division deputies wear the same uniforms as other deputies. They are issued radios, firearms, and vehicles for their patrol duties. The patrol deputies make more arrests each year than deputies with other assignments in the Sheriff's police force.

Between 12 and 14 deputies of the Law Enforcement Bureau are assigned to the Detective Division. All but two of the detective deputies work a day shift; the remaining deputies work an afternoon shift. The duties of the detectives include investigating property crimes and violent crimes in the unincorporated portions of Du Page County. Detective deputies do not routinely make traffic stops or issue traffic tickets and they do not patrol like deputies in the Patrol Division. Detective deputies primarily conduct investigations, and they are not expected to make traffic stops or to provide backup for traffic stops. Detective deputies do not regularly investigate any crimes occurring within the county jail. They will, however, conduct those investigations in the jail that the corrections deputies are unable to carry out.

Eight deputies are employed in the Law Enforcement Bureau's Civil Division. Their responsibilities include serving civil process on members of the public. They are also called upon to act as backup to the Patrol Division in emergency situations. The Civil Division deputies are uniformed, carry firearms, and are required to maintain public order on or off duty. Given their primary responsibility, however, deputies in the Civil Division infrequently make arrests.

Five deputies are assigned to the Drug Abuse Resistance Education program (DARE). They present drug and alcohol awareness programs to elementary school students. They also serve as the primary police contact with the schools. While some deputies work in the DARE program part-time, the deputies who work in the DARE program full-time perform their entire shifts in the schools. The DARE deputies are not regularly assigned traffic duties and do not regularly engage in patrolling a particular area or neighborhood. Likewise, they do not regularly make arrests or testify in court.

A few deputies in the Law Enforcement Bureau are assigned to act as neighborhood liaisons. These deputies will be given a designated area within the county in order to work with citizens and neighborhood groups to identify and solve law enforcement problems occurring in that area. The deputies are granted the authority to communicate with different levels of government and different branches in the Sheriff's office to assist in solving any problems that have arisen in their geographic area. The neighborhood liaison deputies typically perform more in-depth work within a given area than the patrol depu-

ties, who respond to specific and discrete calls for service. While the neighborhood liaisons have the power to effect arrests, like certain other deputies, the nature of their responsibilities means they do not regularly make arrests.

The Law Enforcement Bureau has a Patrol Transport Unit that utilizes two deputies. The deputies transport people arrested by the Patrol Division to the county jail. They also transport prisoners from other local police departments to the county jail. Their entire shift is spent in the marked transport van. If a situation requiring prisoner transport arises before or after the patrol transport deputies' shift, then the duties will be performed by transport deputies from the Corrections Bureau. The duties of the patrol transport deputies from the Law Enforcement Bureau are identical to the duties of the transport deputies of the Corrections Bureau, notwithstanding their distinct bureau assignments. In addition to their transport duties, the patrol transport deputies sometimes serve civil process and assist at the scenes of traffic accidents. Typically, the patrol transport deputies do not write traffic tickets or engage in patrolling any particular area. Further, if the patrol transport deputies are engaged or unavailable, a patrol deputy will personally transport an arrestee to the county jail, if necessary.

The Sheriff's office participates in two task forces, the Du Page County Metropolitan Enforcement Group (DUMEG) and the Beat Auto Theft Through Law Enforcement (BATTLE) task force. Each task force is comprised of members from the law enforcement agencies in and around Du Page County, and each task force is fielded to deal with specific types of crime.

DUMEG is a narcotics and drug trafficking investigation unit that utilizes three deputies from the Sheriff's office. The DUMEG deputies are not assigned to a bureau within the Sheriff's office, but instead, they receive their assignments from the DUMEG task force itself. BATTLE, an auto theft task force, employs one deputy from the Sheriff's office. Like the DUMEG deputies, the deputy assigned to BATTLE is not assigned to a bureau within the Sheriff's office, but instead, the deputy reports to the task force directly. The Sheriff posits that, while none of the task force deputies are currently assigned to a bureau within the office, they will likely be assigned to the Law Enforcement Bureau when their assignments with the task forces are completed.

The Corrections Bureau covers a wide variety of functions relating to the management of prisoners in the county jail. The Corrections Bureau employs over 180 deputies and 30 civilian employees. Each of the deputies is sworn, wears the same uniform as other deputies, and

is endowed with the same powers of arrest and detention as other deputies. Additionally, if a corrections deputy makes an arrest, he or she completes the appropriate paperwork and testifies in court as necessary. The Board determined that most of the deputies in the Corrections Bureau were not "peace officers" and were properly excluded from MAP's proposed bargaining unit.

The Corrections Bureau divides its workday into three shifts: day, afternoon, and night. The Corrections Bureau assigns each deputy to a daily post. No deputy is assigned full-time to guarding the prisoners inside the secured perimeter of the jail. Instead, the corrections deputies are rotated according to daily or weekly schedules. For example, a deputy might be assigned to guard the inmates for one week, then the next week the deputy might be assigned to an outside post, such as the bond court. Thus, during the course of a year, each corrections deputy will have worked in each area at least four times. The interchange among posts within the Corrections Bureau increases when deputies take vacation or sick leave.

The Corrections Bureau uses 36 deputies to guard prisoners and work within the secured perimeter of the county jail during the day shift (a smaller number is used during the night shift). The inmates are housed inside the jail's secured perimeter. There is limited access into the secured perimeter through a series of monitored doors. The corrections deputies assigned to work within the secured perimeter are responsible for protecting the prisoners, keeping order within the jail, and protecting the members of the public who visit both the jail's secured and public areas. Although deputies within the secured perimeter have been assigned firearms, they are not allowed to carry those weapons within the secured perimeter.

Arrests within the secured perimeter occur frequently, such as when the prisoners commit crimes (*e.g.*, batteries, narcotics violations, property damage). As a regular part of their jobs, deputies assigned to work within the secured perimeter subdue and handcuff the prisoners. They also investigate the prisoners' criminal activities. Deputies working within the secured perimeter also frequently search the prisoners, their cells, and visitors to the jail. The deputies also are responsible for protecting the public who visit the jail. A usual day will bring 35 to 75 visitors to the jail either in tour groups or as employees of service provider agencies.

The Corrections Bureau uses 33 deputies in various positions outside of the secured perimeter. These positions include the Sheriff's Work Alternative Program (SWAP), Receiving and Discharge, the Fugitive Apprehension Unit, and the Prisoner Transportation Unit.

The SWAP program uses six or seven deputies to supervise and transport offenders who are performing community service activities like roadside cleanup or painting. The deputies assigned to SWAP transport the offenders in marked vans equipped with emergency lighting, sirens, and radios. The SWAP deputies also check to see if any of the offenders has an outstanding warrant. If an offender breaks the law while under the SWAP deputies' supervision, the deputies will arrest the offender. All SWAP deputies carry handcuffs and radios and wear the same uniforms as the other deputies. The SWAP deputies are issued firearms and empowered to make arrests and detentions and often come into contact with the public.

An anecdote about a SWAP deputy making an arrest was provided. A SWAP deputy, Angela Conn, made an arrest of a reckless driver in the parking lot of the Sheriff's office complex. Deputy Conn made the arrest without calling any other deputies from any other bureaus for assistance.

The Receiving and Discharge area of the jail is staffed with seven deputies along with some civilian employees. The Receiving and Discharge area is an unsecured area that consists of a lobby and an enclosed glass window behind which the deputies and civilian employees are stationed.

Two or three deputies work each shift in the Receiving and Discharge area along with several civilian employees. The deputies working there are uniformed, carry firearms, and are required to enforce the law both on and off duty. The civilian employees cannot enforce the law. They do, however, wear uniforms, but the civilian uniforms are different from those of the deputies.

The deputies assigned to the Receiving and Discharge area have duties that include: answering questions from members of the public who come to visit prisoners in the jail, handling the payment of bail bonds, and managing the attorneys who come to confer with their clients in the jail. The deputies are interacting with the public all day and are responsible for maintaining order and safety in the Receiving and Discharge area.

Deputies in the Receiving and Discharge area are frequently called upon to arrest members of the public on outstanding warrants. These arrests happen several times a week and, sometimes, as many as three or four times in a shift. The deputies are also occasionally called upon to settle disturbances occurring in the adjacent bond court.

Deputy Phil Lynch, who has worked in the Receiving and Discharge area for 14 of his 16 years on the Sheriff's police force, testified that he has arrested a number of people while working there. Lynch testified that the lobby is often filled with people waiting to

visit prisoners in the jail. If there is a warrant for one of the people waiting, then he arrests that person in the lobby. Lynch testified that he has not been instructed to and has never tried to call for backup or assistance from another bureau within the Sheriff's office to assist him in making an arrest. Lynch testified that, over a two-year period, he had made between 100 and 150 arrests, which include those made while he was working in the Receiving and Discharge area as well as those made while he was working an extra-duty detail.

The Young Adult Work Camp, administered by the Corrections Bureau, utilizes five or six deputies. The work camp is located at the western edge of Du Page County and receives eligible young offenders who receive instruction in basic skills and trades (like carpentry) in the hope that the structured atmosphere and education will deter them from committing future crimes. The deputies assigned to the work camp provide management and oversight of the activities. The work-camp deputies wear the same sort of uniform as all of the other deputies, they are armed, and they make arrests when necessary.

The Fugitive Apprehension Unit has 14 deputies assigned from the Corrections Bureau. The unit has two primary responsibilities: transporting offenders and locating and arresting persons for whom arrest warrants have been issued. The unit's deputies generally work outside of the jail and come into daily contact with the public. The unit's deputies are armed, carry handcuffs, and are empowered to make arrests. The Board determined that the deputies assigned to the Fugitive Apprehension Unit were "peace officers" and were properly included in MAP's proposed bargaining unit.

There are six deputies who are responsible for the transport duties of the unit. They are uniformed like all the other Sheriff's deputies. The unit's warrant deputies generally work in plain clothes because they work undercover while searching for the fugitives they are trying to apprehend. The unit's warrant deputies perform detective duties and have received detective training similar to that of the deputies in the Detective Division of the Law Enforcement Bureau and the evidence technicians of the Administrative Bureau. When necessary, the warrant deputies also assist or provide backup for the patrol deputies in making arrests.

The periodic-imprisonment program is staffed by corrections deputies. These deputies are uniformed, carry handcuffs, are armed, and are empowered to make arrests as are the other deputies in the force. They are responsible for work-release prisoners who work during the day and return to the jail at night. Like the other corrections deputies, these deputies store their weapons when working within the secured perimeter of the jail. The deputies assigned to the periodic-

imprisonment program come into frequent contact with the public in and around the courthouse.

Within the Sheriff's office, deputies may transfer from one bureau to another from time to time. Likewise, the Sheriff may decide to transfer a deputy as needs dictate. When completing a transfer, the Sheriff will attempt to accommodate the deputy's wishes (or even medical needs) as well as the needs of the department. Transfer, however, is not used as a form of discipline.

Unless a transfer is temporary, the transferred deputy must become trained and certified in his or her new position. The Sheriff makes sure that the deputy receives the necessary training in a timely manner. Upon completing the training and certification, the deputy does not need to take another oath, because his or her powers as a deputy remain exactly the same.

Although the Sheriff divides his department into three bureaus for administrative and organizational purposes, there remain special units that operate independently of the bureau structure. As a result, a deputy may work with deputies from any of the bureaus in the department.

For example, the Sheriff administers outside details for which any deputy in the department may volunteer. A "detail" is an assignment available for a uniformed deputy outside of the deputy's normally scheduled shift. Details usually call for a deputy to direct traffic or to provide security in a public place or for a business, like a nightclub, church, fairground, or the like. A deputy working a detail will wear his uniform and badges, and carry handcuffs and a weapon. While working a detail, the deputy retains the normal powers of his or her office, like arrest and detention, regardless of his or her usual assignment in the department during his or her regular shift.

Examples of special cross-bureau units include the K-9 unit (comprised of one administrative deputy, two corrections deputies, and six law enforcement deputies), the hazardous device unit (consisting of one administrative deputy, one corrections deputy, and three law enforcement deputies), the Special Weapons and Tactics team (utilizing 2 administrative deputies, 5 corrections deputies, and 21 law enforcement deputies), the gang suppression/problem solving unit (with one administrative deputy, two corrections deputies, and six law enforcement deputies), and the school liaison program (using one administrative deputy, one corrections deputy, and two law enforcement deputies).

Next, we repeat the procedural history of this matter, beginning with the first efforts to unionize the Sheriff's police force. In 1987, the Fraternal Order of Police (FOP) sought to organize a portion of the

Sheriff's police force. The FOP wanted to create a bargaining unit that excluded those deputies working in the Court Security and Corrections Divisions within the Sheriff's police force. According to the FOP, the deputies working in the Court Security and Corrections Divisions were not "peace officers" as defined by section 3(k) of the Act (now 5 ILCS 315/3(k) (West 2004)). Petitioners opposed the FOP's attempt at unionization of the deputies, arguing that the workforce would become fragmented unless all of the deputies were included in the bargaining unit.

The Board's predecessor agreed in part with the FOP, ruling that patrol deputies could be included in the bargaining unit, adding court security deputies to the bargaining unit, but excluding corrections deputies from the bargaining unit. The FOP appealed the decision. This court affirmed, holding that court security deputies were "peace officers" as defined by the Act. *Fraternal Order of Police Lodge No. 109 v. Illinois Labor Relations Board*, 189 Ill. App. 3d 914 (1989). The FOP followed through on its refusal to represent the bargaining unit if the Board determined that court security deputies were "peace officers," and the decision as to the composition of the bargaining unit was rendered moot.

Petitioners also appealed the decision of the Board's predecessor. We dismissed that appeal, however, because the FOP had rejected the representation of the bargaining unit containing court security deputies, resulting in the dismissal of the FOP's representation petition. This left nothing for petitioners to appeal. *County of Du Page v. Fraternal Order of Police, Lodge No. 109*, 183 Ill. App. 3d 1027 (1989). In addition, we held that the decision of the Board's predecessor would not act as *res judicata* against petitioners in any subsequent cases. *County of Du Page*, 183 Ill. App. 3d at 1034.

In 1993, MAP tried to organize the patrol and court security deputies. The Board agreed with MAP's proposed bargaining unit and also determined that certain corrections deputies should also be a part of the bargaining unit. The deputies held a secret ballot election to ratify the union. The deputies rejected unionization.

In December 1999, MAP filed another representation petition, this time seeking to represent all deputies who were "peace officers" under the Act (now 5 ILCS 315/3(k) (West 2004)). A hearing was held, after which an administrative law judge determined that the bargaining unit should include the deputies in the Administrative Bureau, the Law Enforcement Bureau, the Fugitive Apprehension Unit of the Corrections Bureau, and a number of special stand-alone and interdepartmental units. The remaining deputies, who were all assigned to the Corrections Bureau, were excluded from the bargaining unit.

The Board confirmed the decision of the administrative law judge and directed that a secret ballot election be held among the eligible deputies. *MAP Du Page County Sheriff's Chapter 126*, 18 Pub. Employee Rep. (Ill.) par. 2024, No. S—RC—00—059 (ILRB August 23, 2002) (hereinafter *County of Du Page*, 18 Pub. Employee Rep. (Ill.) par. 2024). In May 2002, the eligible deputies voted against representation by MAP. No appeal was undertaken to challenge the propriety of the Board's determination of which deputies qualified as "peace officers" under the Act.

After the deputies' rejection of MAP representation, the General Assembly amended the Act's certification process to include a "majority interest" procedure, allowing unionization of a group of workers without undergoing a secret ballot election. Pub. Act 93—444, eff. August 5, 2003 (adding 5 ILCS 315/9(a—5) (West 2004)). Following the amendment of the Act, the Board promulgated emergency rules to govern the procedures for handling majority-interest-representation petitions. The Board justified the emergency rules as necessary to implement the newly amended Act before final rules were enacted. In February 2004, the Board promulgated its final rules regarding majority-interest petitions.

While the emergency rules were purportedly in effect, on December 18, 2003, MAP filed another representation petition, but this time, MAP proceeded under the majority-interest provision of the Act (5 ILCS 315/9(a—5) (West Supp. 2003)) and pursuant to the Board's emergency rules. In this petition, MAP proposed the same bargaining unit as in the Board's 2002 decision—most corrections deputies would be excluded and only deputies qualifying as "peace officers" would be included. The Board solicited objections from petitioners, and the Sheriff filed a position statement and requested a fact-finding hearing due to a change in circumstances from the 2002 decision. Additionally, along with several other objections, the Sheriff argued that the Board's emergency rules were invalidly promulgated. In February and March 2004, the Sheriff submitted offers of proof, proposed evidence, and made arguments to the Board to support his positions regarding unionization under MAP.

On March 19, 2004, the Board issued a "Tally and Certification" rejecting the Sheriff's objections and declining to hold a fact-finding hearing. The Board's tally showed that a majority of eligible deputies (nearly all corrections deputies were excluded from the tally) favored representation by MAP. Also on March 19, 2004, the Board issued a certification of representative, certifying MAP as the exclusive bargaining representative for the deputies' bargaining unit (deputies below the rank of sergeant assigned to the Administrative Bureau, the Law

Enforcement Bureau, the Fugitive Apprehension Unit within the Corrections Bureau, and the various stand-alone and interdepartmental units). Petitioners timely appealed the Board's decision. On June 2, 2005, this court held that the Board's emergency rules were invalidly enacted and reversed the Board's certification and remanded the matter for further proceedings. *County of Du Page I*, 358 Ill. App. 3d at 183.

On June 15, 2005, MAP filed another representation petition, which is the subject of this appeal. MAP again sought to organize the deputies qualifying as "peace officers" under the Act—the same bargaining unit it had tried to create in the 2002 and 2004 Board decisions. As before, petitioners opposed the petition, contending that all deputies, including corrections deputies, were "peace officers" and should be eligible for membership in the bargaining unit. The Sheriff also argued that section 9(a—5) of the Act (5 ILCS 315/9(a—5) (West 2004)) required the submission of at least two kinds of evidence in order to make the necessary showing of majority interest. Additionally, the Sheriff requested that a hearing be held to consider new evidence that corrections deputies were "peace officers." The Sheriff submitted an offer of proof and a supplemental position statement to the Board. See 395 Ill. App. 3d at 50-61 (summary of the evidence in the record). In addition to setting out the Sheriff's view of the duties and responsibilities of his deputies, the Sheriff's position statement also raised four points to support his argument that the petition should be dismissed. First, the Sheriff argued that the petition was premature due to the fact that the Board had granted a certification to MAP and the appeal in *County of Du Page I* had not yet been exhausted. Second, the Sheriff argued that, under section 9(a—5), MAP was required to present both "dues deduction authorization cards" plus some form of "other evidence" in order to satisfy the majority-certification provision of section 9(a—5). Third, the proposed bargaining unit was too narrow as a result of the exclusion of the corrections deputies. Last, the Sheriff argued that the additional evidence included in his offer of proof, demonstrating the changed circumstances of the Sheriff's office, justified a new fact-finding hearing to address whether the corrections deputies were indeed "peace officers" and eligible for inclusion in the proposed bargaining unit.

On September 6, 2005, petitioners filed a motion to dismiss the MAP petition without prejudice, reiterating their position that MAP was seeking to organize a bargaining unit already existing and that further proceedings were unnecessary until the appeal in *County of Du Page I* was exhausted. The Board agreed to hold the MAP petition in abeyance until the Board's petition for leave to appeal to the

supreme court following this court's reversal of the certification in *County of Du Page I* was resolved. On December 1, 2005, the supreme court denied the Board's petition for leave to appeal the result in *County of Du Page I.*

On January 11, 2006, the Board allowed petitioners to submit an offer of proof regarding their changed-circumstances argument. Petitioners filed the offer of proof and a supplemental position statement. Additionally, petitioners submitted proposed exhibits in case a fact-finding hearing were to be held.

On March 23, 2006, the Board issued its "Tally and Certification." The Board first rejected petitioners' argument that the Sheriff was entitled to review the evidence demonstrating majority support and rejected the attack on the sufficiency of the showing of interest. The Board held that the signature cards alone were sufficient to demonstrate the workers' interest in unionization. The Board then considered the need for a new hearing. The Board noted that petitioners relied on the same information that had been submitted previously, namely, that corrections deputies perform arrests and law enforcement duties occasionally and on a part-time basis through volunteering for details and temporary assignments. The Board found that the current offer of proof did not differ materially from the previously interpreted evidence. The Board decided it could essentially adopt its previous definition of "peace officer" from *County of Du Page*, 18 Pub. Employee Rep. (Ill.) par. 2024, at X-179. As to the Sheriff's cross-training programs and "uni-deputy" concept, the Board held that they did not differ from the previous petitions and rejected them as bases for a new hearing.

Accordingly, the Board held that a sufficient showing of interest had been established in that 111 of 189 eligible deputies had voted in favor of unionization. The Board held that the bargaining unit would consist of deputies below the rank of sergeant and assigned to the Administrative Bureau, the Law Enforcement Bureau, the Fugitive Apprehension Unit within the Corrections Bureau, the School Liaison Unit, the Gang/Suppression/Problem Investigation Unit, the DUMEG group, and the BATTLE consortium.

Petitioners timely appealed the Board's decision. In that appeal, we agreed with petitioners' argument that section 9(a—5) required both dues deduction authorization cards and other evidence of a like character. *County of Du Page II*, 375 Ill. App. 3d at 776. The Board appealed our decision and the supreme court reversed our holding and remanded the cause to us, with the direction that we consider the issues regarding the composition of the bargaining unit. *County of Du Page III*, 231 Ill. 2d at 618.

## ANALYSIS

Preliminarily, we address the parties' motions that we ordered taken with the case. After the parties completed their briefing in this appeal, the Board filed a motion to strike petitioners' reply briefs due to formal defects in the briefs. The Board also sought to strike a portion of the argument in the Sheriff's reply brief. We have considered the Board's contentions and petitioners' responses and we deny the Board's motion to strike the reply briefs and the portion of argument in the Sheriff's reply brief. MAP also filed a motion to modify or correct its prayer for relief in its response brief. We grant MAP's motion. Additionally, after the remand, the Board filed a motion for leave to cite supplemental authority. We grant the Board's motion.

As an initial matter, we recapitulate the well-established principles defining the standard of review for the issues raised in the appeal of an administrative agency's decision. The standard of review depends on whether the issue being reviewed presents solely a question of law, solely a question of fact, or a mixed question of law and fact. *County of Du Page I*, 358 Ill. App. 3d at 179. An issue presenting solely a question of law receives *de novo* review. *County of Du Page I*, 358 Ill. App. 3d at 179. An issue presenting solely a question of fact is reviewed to determine whether the agency's factual findings were against the manifest weight of the evidence. *County of Du Page I*, 358 Ill. App. 3d at 179. An issue presenting a mixed question of law and fact is reviewed for clear error. *County of Du Page I*, 358 Ill. App. 3d at 179.

Having laid the necessary groundwork, we at last come to grips with the substance of petitioners' contentions on appeal. Petitioners argue that the Board erred by failing to find that all of the corrections deputies were "peace officers" under the Act. In particular, petitioners contend that to determine whether a deputy was a "peace officer," the Board used a test that was inconsistent with the plain and unambiguous meaning of the Act, was inconsistent with this court's interpretation of the Act, and improperly transformed "security employee" and "peace officer" into mutually exclusive categories. In addition, petitioners contend that the Board's application of the Act to the record evidence resulted in the clearly erroneous determination that corrections deputies were not "peace officers" under the Act. We will deal with each contention in turn. Before doing so, however, we first consider two arguments raised by respondents that, if accepted, would obviate our need to consider petitioners' contentions.

First, MAP asserts that the Board's decision in 2002 (*County of Du Page*, 18 Pub. Employee Rep. (Ill.) par. 2024) is *res judicata* on the issue of whether corrections deputies are "peace officers" under the Act. Petitioners counter by noting that the Board's peace-officer deci-

sion resulted in the authorization of an election but was not the final order; the Board's certification of representative declaring that the deputies had decided upon no representation was the final order subject to appeal. Because the true final order was not appealed, the Board's interim peace-officer determination was rendered moot. We agree with petitioners that the Board's 2002 decision (*County of Du Page*, 18 Pub. Employee Rep. (Ill.) par. 2024) is not *res judicata* on the issue of whether corrections deputies are "peace officers" under the Act.

Under the doctrine of *res judicata*, "a final judgment on the merits rendered by a court of competent jurisdiction acts as a bar to a subsequent suit between the parties involving the same cause of action." *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 302 (1998). In order for the doctrine of *res judicata* to apply, three requirements must be satisfied: "(1) there was a final judgment on the merits rendered by a court of competent jurisdiction, (2) there is an identity of cause of action, and (3) there is an identity of parties or their privies." *River Park*, 184 Ill. 2d at 302. *Res judicata* does not apply here because the Board's peace-officer decision was not a final judgment.

The Act states:

"[1] An order of the Board dismissing a representation petition, [2] determining and certifying that a labor organization has been fairly and freely chosen by a majority of employees in an appropriate bargaining unit, [3] determining and certifying that a labor organization has not been fairly and freely chosen by a majority of employees in the bargaining unit or [4] certifying a labor organization as the exclusive representative of employees in an appropriate bargaining unit because of a determination by the Board that the labor organization is the historical bargaining representative of employees in the bargaining unit, is a final order." 5 ILCS 315/9(i) (West 2004).

The Act then states that any party aggrieved by such a final order may directly appeal to the appellate court under the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 2004)). 5 ILCS 315/9(i) (West 2004). The order at issue here, the Board's direction that an election be undertaken (*County of Du Page*, 18 Pub. Employee Rep. (Ill.) par. 2024), was not one of the four types of orders that are considered to be final under the Act. Thus, it was not a final order for purposes of the doctrine of *res judicata*, and MAP cannot invoke the doctrine of *res judicata* to prevent our review (if necessary) of the Board's peace-officer decision in this case. We also note that MAP did not claim before the Board that *res judicata* barred it from considering the issue of whether corrections deputies were "peace officers"

under the Act. Usually, the failure to raise an issue or defense before the administrative agency will result in the forfeiture of the issue on administrative review. *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 278 (1998). Thus, even if the order had been final, respondents' failure to raise the issue of *res judicata* to the Board would lead us not to consider the preclusive effect of the Board's 2002 decision now. Accordingly, we reject MAP's *res judicata* contention.

The Board, responding to an argument never made by the Sheriff, argues that the Act does not require it to certify the "most appropriate" unit, but only that the bargaining unit be "appropriate." *Community College District No. 509 v. Illinois Educational Labor Relations Board*, 277 Ill. App. 3d 114, 122 (1996); see also *Sandburg Faculty Ass'n v. Illinois Educational Labor Relations Board*, 248 Ill. App. 3d 1028, 1036 (1993) (the Illinois Educational Labor Relations Act (115 ILCS 5/1 *et seq.* (West 2004)) "does not require that a proposed unit be the 'most appropriate unit'; rather, it designates that the unit be 'appropriate' "). The Board argues that it is indisputable that the unit sought to be certified (*i.e.*, deputies under the rank of sergeant and excluding corrections deputies (except the Fugitive Apprehension Unit)) is "appropriate" and contains personnel over whom there is no dispute as to whether they are "peace officers" under the Act. The Board notes that even if corrections deputies are eventually determined to be "peace officers" under the Act, the proposed bargaining unit that excludes them would still be appropriate, thereby rendering the status of the corrections deputies irrelevant.

Petitioners seize upon the argument and urge that the matter be remanded to require the Board to make a determination whether the bargaining unit must be *an* appropriate unit versus *the most* appropriate unit, apparently hoping to win the issue below or on appeal and thereby lessen the burden they have to carry (if the unit must be the most appropriate, then petitioners likely would have an easier time demonstrating that the proposed unit did not reach that level than disproving that the unit was simply appropriate).[2] Alternatively, petitioners contend that the issue of whether the bargaining unit need be *an* appropriate unit versus *the most* appropriate unit has never been considered in the lengthy history of litigating the question of unionization of the Sheriff's deputies. For that reason alone, petitioners conclude that the Board's argument on that issue should be denied.

---

[2]The notion of remanding for the Board to make a determination regarding a position that it is already arguing on appeal highlights one of the procedural aspects of administrative review that distinguishes the Board's function from that of a trial court.

See *Texaco-Cities Service Pipeline Co.*, 182 Ill. 2d at 278. Petitioners also attack the Board's reliance on cases interpreting the Illinois Educational Labor Relations Act for the proposition that the Board need certify only *an* appropriate bargaining unit rather than *the most* appropriate bargaining unit, on the ground that the Illinois Educational Labor Relations Act does not include express consideration of fragmentation of employee groups when determining the appropriateness of the bargaining unit (see 115 ILCS 5/7(a) (West 2004)), unlike the Act, which requires consideration of fragmentation of employee groups (see 5 ILCS 315/9(b) (West 2004)).

While we hold that the Board's contention is compatible with the Act (see *Administrative Office of the Illinois Courts v. State & Municipal Teamsters, Chauffeurs & Helpers Union, Local 726*, 167 Ill. 2d 180, 193 (1995) ("Under the Act, the particular labor board having jurisdiction over the employer is required to determine appropriate bargaining units")), it is not the game winner that the Board hopes. The Board's argument attempts to end consideration of the bargaining unit here, saying, in effect, even if the corrections deputies are peace officers, the current unit is sufficiently appropriate without the corrections deputies, and a different bargaining unit comprised solely of corrections deputies may be constituted later. Petitioners, however, have never been impeded by the Board's new argument. All along petitioners have argued that the bargaining unit was not appropriate; they have never argued that the bargaining unit was or might be *an* appropriate unit, but failed because it was not *the most* appropriate bargaining unit. Even accepting the Board's argument, petitioners can be seen to still contend that, because the corrections deputies are not included in the bargaining unit, the bargaining unit impermissibly fragments a body of nearly 400 peace officers into at least two bargaining units, rendering the proposed bargaining unit improper. Thus, we must return to petitioners' remaining arguments to resolve the controversy.

Petitioners first contend that the Board's test to determine whether a deputy was a "peace officer" conflicts with the plain and unambiguous meaning of the term in the Act. Section 3(k) of the Act defines "peace officer":

" 'Peace officer' means, for the purposes of this Act only, any persons who have been or are hereafter appointed to a police force, department, or agency and sworn or commissioned to perform police duties, except that the following persons are not included: part-time police officers, special police officers, auxiliary police as defined by section 3.1—30—20 of the Illinois Municipal Code, night watchmen, 'merchant police', court security officers as defined by

section 3—6012.1 of the Counties Code, temporary employees, traffic guards or wardens, civilian parking meter and parking facilities personnel or other individuals specially appointed to aid or direct traffic at or near schools or public functions or to aid in civil defense or disaster, parking enforcement employees who are not commissioned as peace officers and who are not armed and who are not routinely expected to effect arrests, parking lot attendants, clerks and dispatchers or other civilian employees of a police department who are not routinely expected to effect arrests, or elected officials." 5 ILCS 315/3(k) (West 2004).

Petitioners note that the Act defines "peace officers" in terms of performance of police duties, and not in terms of the location the duties are performed or the amount of time during the workday that a person performs his or her duties. See, *e.g.*, 5 ILCS 315/3(p) (West 2004) (" 'Security employee' means an employee who is responsible for the supervision and control of inmates at correctional facilities"); 5 ILCS 315/3(r) (West 2004) (" 'Supervisor' is an employee whose principal work is substantially different from that of his or her subordinates and who has authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, or discipline employees ***. *** [T]he term 'supervisor' includes only those individuals who devote a preponderance of their employment time to exercising that authority"). Petitioners argue that the General Assembly's use of geographic or temporal restrictions in the definitions of "security employee" and "supervisor" but not in the definition of "peace officer" means that it did not intend for the Board to engage in such an analysis. In support, petitioners cite to *In re K.C.*, 186 Ill. 2d 542, 549-50 (1999), for the proposition that "[i]t is well established that, by employing certain language in one instance and wholly different language in another, the legislature indicates that different results were intended." Petitioners conclude by charging that the Board violated this intent, revealed through the use of language without temporal or geographic restrictions, when the Board declared that "the proper focus in determining peace officer status is upon the individuals' *primary* responsibilities and the authority *actually exercised* in the *regular* course of their duties." (Emphasis in original.) *County of Du Page*, 18 Pub. Employee Rep. (Ill.) par. 2024, at X-180. According to petitioners:

"[B]y using the plain words [in the definition of peace officer,] 'sworn and commissioned to perform police duties,' the General Assembly intended to define a 'peace officer' in terms of those 'police duties' that he or she was originally commissioned to perform, regardless of where or how often they are performed. In light of this plain and ordinary meaning of [s]ection 3(k) [of the

Act], the Board's reliance on the location and actual exercise of those job duties and responsibilities must be rejected."

We do not agree with petitioners' contention that the Board embellishes upon the plain and ordinary meaning of the definition of "peace officer" in its decision. In the first place, petitioners rely on a species of *expressio unius est exclusio alterius* (including one thing implies the exclusion of the other or the alternative) in attempting to discern a material difference in the definitions of "peace officer," "security employee," and "supervisor" in the Act. We note, however, that each of the three definitions is properly seen to be based on the *duties* of the position, and not, as petitioners contend, in terms of temporal or geographic restrictions. For example, a "security employee" is one who is "responsible for the *supervision* and *control* of inmates." (Emphases added.) 5 ILCS 315/3(p) (West 2004). This definition, then, expresses the duties of the security employee, which are to supervise and control inmates. It lists a geographic restriction, "at correctional facilities," but the duties are clearly expressed and the duties define the position. Likewise, "supervisor" includes a temporal restriction, but initially, "supervisor" is defined in terms of the sorts of duties in which a supervisor will engage: a supervisor "has authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, or discipline employees." 5 ILCS 315/3(r) (West 2004). Further, the supervisor's authority "is not of a merely routine or clerical nature, but requires the consistent use of independent judgment." 5 ILCS 315/3(r) (West 2004). Only after setting forth the duties and responsibilities of a supervisor does the definition limit it to "those individuals who devote a preponderance of their employment time to exercising that authority." 5 ILCS 315/3(r) (West 2004). We note, as well, that the temporal restriction does not apply to police employment. 5 ILCS 315/3(r) (West 2004). Thus, in terms of police employment, the supervisor is defined solely by the responsibilities and duties of the position.

Notably, the authority for petitioners' *expressio unius* contention is clearly distinguishable. In *K.C.*, the issue was whether, by eliminating the mental state from the damage-to-a-vehicle provision in the Illinois Vehicle Code (625 ILCS 5/4—104 (West 1996)), but including it in the criminal-trespass-to-a-vehicle offense in the Criminal Code of 1961 (720 ILCS 5/21—2 (West 1996)), the legislature meant to draw a distinction between the two statutes. *K.C.*, 186 Ill. 2d at 549-50. The supreme court concluded that, because the mental state was specifically included in the Criminal Code, and because the mental state was specifically deleted from the Illinois Vehicle Code, "the legislature was drawing a meaningful distinction between the two statutes." *K.C.*, 186

Ill. 2d at 550. Here, by contrast, each definition is based on the duties the individual is expected to perform. 5 ILCS 5/315(k) (West 2004) (police duties); 5 ILCS 5/315(p) (West 2004) (supervise and control inmates); 5 ILCS 5/315(r) (West 2004) (hire, fire, promote, demote employees). Accordingly, we cannot accept petitioners' *expressio unius* contention.

Second, and more importantly, petitioners' *expressio unius* contention ignores relevant authority. In *Fraternal Order of Police Lodge No. 109 v. Illinois Labor Relations Board*, 189 Ill. App. 3d 914 (1989) (*FOP*), this court considered whether bailiffs (encompassed within the Administrative Bureau in the Sheriff's office in this case) were peace officers under the Act. This court concluded that "police duties encompass a wide variety of law enforcement and order-maintenance functions including arrest, crime prevention and deterrence, crowd control, investigation, providing aid, and creating and maintaining a feeling of security." *FOP*, 189 Ill. App. 3d at 918. We concluded that the operative question was not whether bailiffs performed all conceivable police duties, or even the same duties as other officers on the force, but whether the actual duties performed by the bailiffs were police duties under the Act. *FOP*, 189 Ill. App. 3d at 918.

Here, petitioners take issue with the Board's formulation of the issue in its 2002 decision: "the proper focus in determining peace officer status is upon the individuals' *primary* responsibilities and the authority *actually exercised* in the *regular* course of their duties." (Emphases in original.) *County of Du Page*, 18 Pub. Employee Rep. (Ill.) par. 2024, at X-180. In other words, the Board focused upon whether the actual duties performed by the corrections deputies in that case were police duties, instead of focusing upon hypothetical powers with which the deputies were endowed as a result of being sworn deputy sheriffs. Thus, the Board's inquiry was precisely that called for both by the Act and by relevant authority. Accordingly, we reject petitioners' initial Act-based contention.

Next, petitioners contend that the Board's test for "peace officer" was inconsistent with prior authority and, particularly, with *FOP*, 189 Ill. App. 3d 914. According to petitioners, this court in *FOP*, 189 Ill. App. 3d at 918-19, analyzed the bailiffs' duties to determine whether their duties constituted "police work" under the Act, thereby qualifying the bailiffs for "peace officer" status under the Act. Key to our decision, according to petitioners, were the following facts established in the record: (1) the bailiffs were uniformed and wore badges, which provided a crime deterrent; (2) the presence of the uniformed and sometimes-armed bailiffs contributed to the maintenance of order; (3) the presence of armed and uniformed bailiffs contributed to a feeling

of security for the witnesses, victims, courtroom personnel, and general public using the courthouse; (4) the bailiffs occasionally searched for weapons and contraband; and (5) the bailiffs were authorized to and occasionally did make arrests of persons in the court facilities. *FOP*, 189 Ill. App. 3d at 918. Petitioners continue that the Board's emphasis on the individual's primary employment responsibility was erroneous and that this error was compounded by the Board's "requirement that a 'peace officer' protect the general public and monitor a 'public arena.' " According to petitioners, this court made no such analysis in *FOP*, and the Board's analysis violated the focus on the duties exercised by the bailiffs. We disagree with petitioners' contention.

In *FOP*, we stated that "[t]he only issue which remains [to be determined there] is whether [the bailiffs] perform 'police duties' as that term is used in the Act." *FOP*, 189 Ill. App. 3d at 917. We also stated that "[o]ur inquiry, therefore, is not whether the bailiffs in Du Page County perform all possible police duties or whether they perform the same duties as the patrol officers; rather, we must determine whether the duties performed by Du Page County bailiffs are police duties." *FOP*, 189 Ill. App. 3d at 918. Thus, our inquiry in *FOP* was clearly directed at whether the actual activities carried out each day by the bailiffs qualified as "police duties" under the Act.

This focus in *FOP*, whether the duties performed by the personnel in question are those of "peace officers," is followed in both *County of Du Page*, 18 Pub. Employee Rep. (Ill.) par. 2024, and the Board's underlying decision in this case. In *County of Du Page*, the Board relied on both the evidence presented by petitioners and the terms of the Act in determining that corrections deputies were not "peace officers." Specifically, the Board looked to the definition of "peace officer" and the statutory exclusions in determining that the focus of the inquiry was upon the deputy's "primary responsibilities, actually exercised on a day-to-day basis." In arriving at this conclusion, the Board noted that section 3(k) of the Act excluded "part-time police officers" from its definition of "peace officer." 5 ILCS 315/3(k) (West 2004). In order to avoid elevating a part-time police officer to the status of peace officer, the Board concluded that the primary responsibility of the deputy was determinative of the deputy's status, and that the temporary and sporadic duties, even if they overlapped with typical duties of a peace officer, could not be weighed more heavily than the essence of the position under consideration or its primary duties. With this in mind, the Board rejected the evidence that, occasionally, corrections deputies worked outside details or were given temporary assignments that entailed some police duties, like

maintenance of public order, effecting arrests, and crime prevention and investigation. Instead, the Board considered the primary responsibility of the corrections deputies, which is to supervise and control inmates in the jail. This primary responsibility precluded the Board from determining that corrections deputies were peace officers.

We have carefully reviewed the Board's decision in *County of Du Page*, 18 Pub. Employee Rep. (Ill.) par. 2024, in light of our decision in *FOP*. We conclude that the Board's rationale does not violate *FOP*'s focus on the actual daily duties of the personnel in question. The issue here, as in *County of Du Page*, is, what does a corrections deputy do? The answer, supervising and controlling inmates, is truly the corrections deputy's primary responsibility. We agree with the Board that it would elevate form over substance to determine that the incidental exercise of a generally accepted police duty (like making arrests) during temporary, occasional assignments and outside details would transform the fundamental nature of the corrections deputy's duties into those of a peace officer. We cannot find that the Board's decision in *County of Du Page*, 18 Pub. Employee Rep. (Ill.) par. 2024, was clearly erroneous.

In turn, the Board in this case relied on the reasoning and results of *County of Du Page* in reiterating its determination that corrections deputies were not peace officers under the Act. In addition, the Board here was asked to consider whether there were changed circumstances that would have warranted a new evidentiary hearing. The Board concluded that petitioners presented effectively the same evidence as that which was presented in *County of Du Page*. Because the same evidence was presented, the same analysis that was employed in *County of Du Page* would remain adequate to decide here whether corrections deputies were peace officers. Having reviewed the evidence and the Board's decision here, we cannot conclude that the Board's determination was clearly erroneous. Accordingly, we reject petitioners' arguments that the Board's decisions were inconsistent with case law and this court's determination in *FOP*.

Next, petitioners argue that the Board improperly viewed the terms "security employee" and "peace officer" as being mutually exclusive. See 5 ILCS 315/3(k), (p) (West 2004). Petitioners argue that the fact that the Act contains separate definitions for "peace officer" and "security employee" does not mean that the terms are mutually exclusive. Petitioners note that it is possible to be a peace officer and yet to be excluded from the operation of the Act by virtue of being a "supervisor" (5 ILCS 315/3(r) (West 2004)).

Petitioners suppose that the "primary responsibility test" utilized here was derived from *Du Page County Sheriff's Department*, 4 Pub.

Employee Rep. (Ill.) par. 2038, No. 5—RC—88—15 (ILRB August 24, 1988) (*County of Du Page 1988*, 4 Pub. Employee Rep. (Ill.) par. 2038), in which the Board opined that the Act's creation of three categories of protective service employees (firefighters (see 5 ILCS 315/3(g—1) (West 2004)), peace officers (see 5 ILCS 315/3(k) (West 2004)), and security employees (see 5 ILCS 315/3(p) (West 2004))) required the categories to be treated as separate groups with no group subsumed within the definition of another. *County of Du Page 1988*, 4 Pub. Employee Rep. (Ill.) par. 2038. According to petitioners, in the 2002 case before the Board, they demonstrated that the Board's mutual-exclusivity theory was incorrect. It was as a result of this proof that the Board took its mutual-exclusivity theory underground and came up with the "primary responsibility test" as a way to preserve the mutual-exclusivity theory without using the express words. According to petitioners, the primary-responsibility test means that a security employee cannot be a peace officer (or the other way around) because the individual's primary responsibility will always serve to place him or her into one and only one category. Petitioners argue that the fact that an individual can be simultaneously a peace officer and a supervisor gives lie to the mutual-exclusivity theory as it is embodied in the primary-responsibility test. We disagree with petitioners' contention.

In the first place, the Board's treatment of the corrections deputies who comprise the Fugitive Apprehension Unit refutes petitioners' contention. The Board has consistently looked at the duties actually performed by the members of the Fugitive Apprehension Unit in determining that they are "peace officers" under the Act. Thus, the label of the deputy—corrections, law enforcement, or administrative—is not controlling. If it were, then the members of the Fugitive Apprehension Unit would be excluded from the bargaining unit because they are corrections deputies. Instead, they are included, because the Board considered their primary responsibilities in determining that they qualified as "peace officers" notwithstanding that they were also corrections deputies.

Turning to the rationale of the Board, even a cursory glance at the Board's decision in this case or in *County of Du Page*, 18 Pub. Employee Rep. (Ill.) par. 2024, refutes petitioners' argument. In this case, the Board examined the evidence of what duties the corrections deputies actually performed. It concluded that the supervision and control of inmates was the primary responsibility, with any police duties, like maintaining public order, being performed only on a temporary, sporadic, or part-time basis. Thus, the Board looked at the duties the corrections deputies (who were indisputably security employees) actually performed to see if their duties qualified them to

be peace officers. Because the Board considered that the duties of the corrections deputies could possibly qualify them as peace officers too, it could not have considered the categories mutually exclusive.

Likewise, in *County of Du Page*, 18 Pub. Employee Rep. (Ill.) par. 2024, at X-179, the Board stated that it must "now determine whether [the corrections deputies], unlike typical security employees, possess[ed] such additional authority that [they] are also statutory peace officers." Again, the Board did not pigeonhole the deputies into a single category, but it was willing to investigate whether additional duties qualified the deputies to be considered "also statutory peace officers." This again belies petitioners' contention that the Board deemed the categories to be mutually exclusive. Accordingly, we reject petitioners' argument on this point.

Petitioners also argue that the nonexclusivity of the three categories is seen from the listing of exceptions to the status of "peace officer" in section 3(k) of the Act. According to petitioners, the 15 exclusions invoke the *expressio unius* rule of construction; because if the list of exclusions does not include corrections officers, then a corrections officer cannot be prohibited from simultaneously being a peace officer as well. This argument overlooks that there are two levels of the *expressio unius* doctrine operating at once here. First, the more specific level pertains to section 3(k) and the definition of "peace officer." A "peace officer" is one who, among other things, performs police duties, except if he or she falls into one of the 15 denominated exclusions. Second, the more general level pertains to the definitions of the protective service employees in section 3. Because "peace officer" is defined apart from security employee and firefighter, those are the three protective service categories, no others can be added, and the categories cannot be commingled. We note that section 3(s) prohibits a bargaining unit from containing both peace officers and nonpeace officers unless all parties consent. 5 ILCS 315/3(s) (West 2004). The issue on the more general level is to determine in which of the three types of protective services an individual belongs. The definition of each category is used to determine this, applying the exclusions if necessary to keep the individual out of the peace-officer category. Thus, the *expressio unius* doctrine does not quite apply in the manner suggested by petitioners and we reject their argument.

Petitioners complain that the Board's implicit holding that the categories of security employee and peace officer were mutually exclusive caused the Board to ignore or undervalue the significant evidence that deputies assigned to the Corrections Bureau exercise police duties both in the jail and in outside details. There is a problem, however, with the logic of petitioners' argument. If the incidental

exercise of police duties, plus the possession of a badge, a uniform, and the right to carry weapons, entitled one to possess the status of "peace officer," then all security employees (like the corrections deputies here) who were badged, uniformed, and armed and occasionally exercised police duties would be peace officers. This runs afoul of the express exclusion of part-time police officers from the category of "peace officer" in section 3(k) of the Act. (We note that petitioners do not argue that the primary responsibility of corrections deputies is to exercise police duties and the evidence supports the determination that any police duties exercised by the corrections deputies are ancillary to their primary responsibilities of supervising and controlling prisoners. Thus, the part-time exercise of police duties would effectively make a hypothetical corrections deputy a part-time police officer, who is expressly excluded from the category of "peace officer.") Additionally, accepting petitioners' argument runs the risk of making redundant one or the other category of "peace officer" or "security employee" and writing it out of the Act. (If the trappings of the position of "peace officer" are all that need be shown, then any security employee who is badged, uniformed, and armed and occasionally makes arrests or conducts crime investigations in the jail must be considered to be a "peace officer," thereby rendering the section 3(p) definition of "security employee" redundant and without effect.) Principles of statutory construction teach us to avoid constructions that render portions of the statute meaningless. *People v. Ellison*, 383 Ill. App. 3d 146, 147 (2008). Petitioners' contention runs afoul of this principle.

Petitioners' main disagreement with the Board's decision revolves around the Board's focus on the position's primary responsibilities. In other words, while the Board acknowledged and accepted that a corrections deputy performs police duties, like effecting arrests and maintaining general public order and safety when involved in outside details, it nevertheless determined that these police duties were of such a temporary, occasional, and sporadic nature that they did not outweigh the primary responsibility of a corrections deputy, which is to supervise and control the inmates in the jail. In light of the fact that, if the temporary, occasional, and sporadic fulfillment of police duties rendered security employees peace officers under the Act, it would effectively void one or the other category, the Board needed to develop some reasonable test to allow individuals possessing some characteristics of both categories to be placed into a single category (as application of the *expressio unius* doctrine requires). We cannot say that the primary-responsibility test is clearly erroneous based on these considerations. Even though petitioners vehemently disagree with the Board's consideration and determination of the evidence, our review

of the record shows that the opposite conclusion is not readily apparent. Thus, we cannot say that the Board clearly erred in determining that the corrections deputies were not peace officers, in light of the fact that any police duties completed by the corrections deputies were temporary, occasional, and sporadic. As a result, we conclude that the Board's refusal to find the corrections deputies to be peace officers under the Act was not clearly erroneous.

Petitioners also argue that *County of Vermilion v. Illinois Labor Relations Board*, 344 Ill. App. 3d 1126 (2003), stands for the proposition that an individual can belong to more than one category set out in section 3 of the Act. While petitioners are not entirely incorrect in their broad reading of *County of Vermilion*, we note that they attempt to wrench more from the case than is reasonable. In *County of Vermilion*, the issue was whether corrections officers holding the rank of sergeant could be part of an appropriate bargaining unit under section 3(s)(1) of the Act. *County of Vermilion*, 344 Ill. App. 3d at 1128. Section 3(s)(1) prohibits supervisors from being in a bargaining unit containing nonsupervisors. See 5 ILCS 315/3(s)(1) (West 2004). The issue devolved into whether the sergeants exercised such supervisory authority and duties that they would be considered supervisors for the purposes of section 3(s)(1). *County of Vermilion*, 344 Ill. App. 3d at 1132. Among the issues raised was whether the sergeants were engaged in "police employment," because, under section 3(r) of the Act, if an individual is engaged in police employment, he or she need not devote a preponderance of his or her employment time to exercising supervisory authority. 5 ILCS 315/3(r) (West 2004); *County of Vermilion*, 344 Ill. App. 3d at 1133-34.

The court noted that the sergeants spent a small amount of time on supervisory activities and had the power to suspend subordinate corrections officers. *County of Vermilion*, 344 Ill. App. 3d at 1131. In *dicta*, the court considered whether the sergeants were engaged in police employment, noting that, if the sergeants were not supervisors, then the corrections officers staffing the jail would operate without supervision for a large part of the time; so even though the sergeants exercised a small amount of supervisory authority, it would not be unreasonable to believe that they were representatives of their employer. *County of Vermilion*, 344 Ill. App. 3d at 1134, quoting *City of Freeport v. Illinois State Labor Relations Board*, 135 Ill. 2d 499, 522 (1990). However, the court declined to resolve the issue of whether the corrections sergeants engaged in police employment, deferring to the expertise of the Board because the Board had not yet considered the issue and because the employers never raised the issue before the Board as to whether the corrections sergeants were engaged in police employment. *County of Vermilion*, 344 Ill. App. 3d at 1134-35.

Petitioners argue that the willingness of the court to accept that the corrections sergeants in *County of Vermilion* might be engaged in police employment means that the court accepted that an individual could simultaneously be in both the security-employee category and the peace-officer category and that this refutes the Board's implicit position that the categories of security employee and peace officer are mutually exclusive. We disagree. In the first place, there is no implicit holding of exclusivity. Rather, after finding that the corrections deputies here were security employees, the Board expressly stated that it "must now determine whether they, unlike typical security employees, possess such additional authority that [they] are also statutory peace officers." Thus, there is no implicit holding to refute. Second, the Board's express determination that it needed to consider whether the corrections deputies here *also* were statutory peace officers comports with the *dicta* in *County of Vermilion*. Both the Board and the court in *County of Vermilion* recognized that an individual could belong in more than one category at the same time. Last, *County of Vermilion* dealt with whether the corrections sergeants were supervisors and not whether the corrections sergeants were both security employees and peace officers. In that respect, then, it is inapposite, especially because *County of Vermilion* expressly declined to consider the issue that was the subject of its *dicta*. For these reasons, then, we do not accept petitioners' analysis of *County of Vermilion*.

While petitioners have presented extensive arguments that the Board erred by deeming that the categories of "security employee" and "peace officer" were mutually exclusive, we have accepted none of their arguments. Accordingly, we find no error, clear or otherwise, in the Board's treatment of the categories in section 3 of the Act.

In their final argument challenging the Board's determination of a proper bargaining unit, petitioners contend that the evidence of record "clearly demonstrates that all correctional Sheriff's deputies are 'peace officers,' thereby justifying inclusion in MAP's proposed bargaining unit." Petitioners contend that they provided sufficient evidence that the corrections deputies exercised police duties to qualify them as peace officers under the Act. We disagree.

Petitioners expend considerable effort in detailing the manners in which corrections deputies engage in police duties, especially focusing on their activities in the outside details. Likewise, respondents expend similar effort in demonstrating that the police duties of the corrections deputies are a relatively insignificant portion of the deputies' employment time and responsibility. Our careful review of the record does not result in a determination that either petitioners' or respondents' position is wholly without merit. The corrections depu-

ties do engage in police duties; however, they engage in these police duties only occasionally and temporarily. In light of our resolution of the issues based on the interpretation of the Act, we cannot say that the occasional police duties performed by the corrections deputies are of such significance, compared with their daily duties of supervising and controlling the inmates under their care, that the relatively insignificant amount of police duties should transform them into peace officers for the purposes of a collective bargaining unit. Thus, while there is certainly merit on both sides of the argument, we cannot discern that the evidence so strongly requires a different interpretation that the Board's conclusion constitutes clear error. In other words, there is nothing so obviously wrong with the Board's decision that the opposite result should be compelled. Accordingly, we hold that the Board's application of the law to the evidence of record, resulting in the determination that corrections deputies do not qualify as peace officers under the Act, is not clearly erroneous.

## CONCLUSION

For the foregoing reasons, the order of the Illinois Labor Relations Board certifying MAP as the exclusive representative is affirmed.

Affirmed.

ZENOFF, P.J., and BOWMAN, J., concur.